**Terry L. JONES, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 4:92CV3029.**

United States District Court,
D. Nebraska.

June 19, 1998.

Robert B. Creager, Anderson, Creager & Wittstruck, P.C., Lincoln, NE, Sandra L. Dougherty, Lieben, Dahlk, Whitted, Houghton, Slowiaczek & Jahn, P.C., Omaha, NE, for plaintiffs.

Thomas J. Monaghan, United States Attorney, Sally R. Johnson, Assistant United States Attorney, Lincoln, NE, Michael J. Salem, Gerald A. Role, Trial Attorneys, Tax Division, U.S. Department of Justice, Washington, D.C., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

Terry and Pat Jones, and the companies they own, seek damages pursuant to 26 U.S.C. § 7431(c) in their suit against the United States based on an Internal Revenue Agent's disclosure of tax return information to a confidential informant which allegedly resulted in damage to the Joneses and their companies. Following a bench trial and subsequent briefing by the parties on the issue of damages, I now issue my findings of fact and conclusions of law[1] in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, I find and conclude that judgment should be entered against the United States and in favor of Terry and Pat Jones for much, but not all, of the damages they seek.

### I. BACKGROUND

During the liability phase of this litigation, I concluded that (1) IRS Special Agent Angelo Stennis violated the provisions of 26 U.S.C. § 6103(a) when he disclosed to a confidential informant on January 31, 1990, that "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, ... let [me] know"; (2) the disclosure was not exempted by the provisions of 26 U.S.C. § 6103(k)(6); and (3) because the taxpayers failed to prove Agent Stennis' disclosure was based on a bad-faith misinterpretation of section 6103(k)(6), the United States had no liability to the plaintiffs pursuant to 26 U.S.C. § 7431(b). *Jones v. United States*, 898 F.Supp. 1360, 1387–88 (D.Neb.1995) (*Jones I*).

The Eighth Circuit Court of Appeals agreed with my conclusions regarding section 6103, but reversed on the "bad-faith" issue, holding that the United States bears the burden of proving good faith under 26 U.S.C. § 7431(b), as opposed to the plaintiff bearing the burden to prove bad faith. *Jones v. United States*, 97 F.3d 1121, 1124–25 (8th Cir.1996) (*Jones II*). Thus, the case was remanded for a determination of whether the United States had met the burden of demonstrating that Agent Stennis' actions met the objective standard of "good faith." *Id.* at 1125.

On remand, I found that the United States failed to prove that Agent Stennis' actions met the objective standard of "good faith," revoked the previous judgment in favor of the United States, found in favor of the plaintiffs and against the United States on the issue of liability, and referred this matter to Magistrate Judge Piester for expedited progression regarding trial on damages. *Jones v. United States*, 954 F.Supp. 191, 195 (D.Neb.1997) (*Jones III*).

After a three-day bench trial on damages and subsequent briefing by the parties, this matter is now ripe for decision.

### II. FINDINGS OF FACT

Because the facts of this case on the issue of liability are set out in detail in my prior opinions, I shall not repeat them here. *Jones I*, 898 F.Supp. at 1365–72 (part I.B., findings 1–82); *Jones III*, 954 F.Supp. at 192 (amending previous factual findings to con-

---

1. To the extent the court's findings of fact can be construed as conclusions of law, they should be so construed. Similarly, to the extent the court's conclusions of law can be construed as findings of fact, they should be so construed.

form to stipulation that Agent Stennis never had any direct contact or run-ins with Terry Jones). I simply incorporate those findings herein as if I had set them forth verbatim. I will focus on the evidence presented to me during the damages trial.

However, a brief summary of my previous decision is helpful to put the damage issues in context. I previously found that the government is liable to the plaintiffs because an IRS criminal investigator unlawfully told a confidential informant that the government intended to execute a search warrant at the plaintiffs' place of business. *Jones III,* 954 F.Supp. at 193–95. Specifically, the agent told the informant the day before the warrant was executed that: "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, ... let [me] know." *Jones I,* 898 F.Supp. at 1379. In context, this "disclosure amounted to notification that the tax returns of Terry Jones and Jones Oil were 'subject to other investigation or processing,' as defined by 26 U.S .C. § 6103(b)(2)." *Id.* at 1379–80.

### Jones Oil Company

1. Terry Jones graduated from the business college at the University of Nebraska at Lincoln in 1958, after which he became employed as credit manager with the Television Service Company, a manufacturer and distributor of television antennas, radios, and citizen band radios. He remained with that company—which ultimately became HyGain Electronics—for 15 years, during which he was promoted to controller and operations vice-president. Terry Jones also operated residential and commercial real estate businesses in Lincoln, Nebraska; owned thousands of acres of farmland in Nebraska, Kansas, and Texas; and published television repair and amateur radio operator manuals. Terry and Patricia (Pat) Jones have purchased, built, and operated apartments since 1965; operated NCB, a service to recover insufficient-fund checks; and owned a publishing company. (Tr. 20:12–26:11; 63:1–20; 87:21–22.)

2. In the time frame relevant to this lawsuit, Terry and Pat Jones owned a partnership called Jones Petroleum, with Terry owning 49 percent of the interest and Pat owning 51 percent. Jones Petroleum owned a holding company called J.O. Holding, Inc., which in turn owned several other entities, including Jones Oil Company, Inc., a Nebraska corporation, and Jones Publishing. (Tr. 31:5–20; 47:5–14; 109:11–110:4; Ex. 72.) Terry and Pat Jones controlled all of the Jones' entities through their holding company. (Tr. 153:6–7.) During the relevant time frame, J.O. Holding, Inc., filed a consolidated tax return which included Jones Oil Company as a subsidiary. (Tr. 444:6–23; Ex. 61.)

3. Pat Jones was a board member, officer, and owner of Jones Oil Company and served as Terry Jones' "administrative assistant" with that company. In fact, she owned a controlling interest in Jones Oil by virtue of her 51–percent interest in the holding company. (Tr. 172:5–20; Ex. 61 at Statement 18 (disclosing in Consolidated Corporate Income Tax Return that Pat Jones owned 51 percent of the holding company for tax year ending October 31, 1990).) However, her focus was overseeing the Jones' apartments and a check recovery company. (Tr. 63:10–20; 172:25–173:5; 410:3–22.) Pat Jones was also a joint taxpayer with her husband, Terry. (Tr. 190:15–22; Ex. 68.)

4. In 1975, Terry Jones purchased an oil jobber or distributorship which owned five or six gasoline stations and had four to six customers that used gasoline in large quantities. At that time, Jones also purchased property at the corner of 33rd and Cornhusker Streets in Lincoln, Nebraska, to be used as the office for Jones Oil Company. (Tr. 27:2–29:5.)

5. Jones continued to purchase gasoline stations—eventually acquiring 20 at one point—and gained additional customers for Jones Oil's petroleum products through a telemarketing sales staff. These petroleum products included gasoline, diesel fuel, aviation fuel, and heating oil. From 1975 to February 1990, Jones Oil Company increased its annual sales from 1.5 million to approximately 15 million dollars. (Tr. 27:2–30:18; 32:10–14.)

6. Jones Oil operated by having credit arrangements with various Gulf Coast refineries that allowed common carriers working for Jones Oil to obtain petroleum products on

preapproved credit from the "common carrier pipeline"—a pipeline into which all refineries place the same product and which is accessible by terminals placed approximately every 50 miles throughout the United States. Each refinery places the same product into this pipeline, but puts additives in the product upon its withdrawal from the terminal so as to create its own product or brand. Jones Oil typically would determine the lowest-priced product each day via daily faxes from the 20 to 30 refineries with which it did business and would then dispatch common carrier trucks to withdraw fuel from approximately 200 terminals throughout the United States for delivery to the customers who were paying the highest prices in the geographic region. (Tr. 32:15–36:12.)

7. Jones Oil had credit arrangements with "all the refineries" which were obtained through the refineries' area representatives after the refineries reviewed Jones Oil's financial statements and "morals . . . character . . . [and] integrity." Terry Jones testified that the latter three factors were important because the terminals described above were not attended during nights and weekends, and common carriers were authorized to enter the terminals with a key and were trusted to withdraw the proper amount of fuel on Jones Oil's behalf. These credit arrangements were memorialized with letters of credit containing a certain credit limit and discount factor of "[o]ne percent, 10 days"—that is, Jones Oil got a one-percent discount if it paid for the product within 10 days. (Tr. 36:16–40:20, 55:14–56:19; Exs. 21, 25, 26, 28–30.)

8. Jones Oil required the customers to whom it delivered petroleum products to pay for the products within 30 days. In order to bridge the gap between the time Jones Oil was required to pay the refineries and the time Jones Oil's customers paid it, Jones Oil had a line of credit of 1.5 million dollars with FirsTier Bank in Lincoln. In order to obtain that line of credit, Jones Oil pledged its accounts receivable to FirsTier. (Tr. 40:21–42:8.) Specifically, FirsTier would extend Jones Oil an 80–percent line of credit on the value of each day's invoices. Jones Oil would use that 80 percent to pay the refineries within 10 days in order to receive a discount, and Jones Oil would pay off the FirsTier loan

at the end of the customers' 30–day period and would retain the remainder as profit, from which the fixed expenses of Jones Oil's operation were deducted.

9. This method of operation was successfully in place at Jones Oil from the late 1970's to February 1990, and at no time during that period was Jones Oil in default with FirsTier or behind on refinery payments such that Jones Oil could not get the 10–day discount. (Tr. 42:9–44:4; 57:16–20.) At no time prior to February 1990 did any refinery terminate its credit arrangement with Jones Oil, nor or did anything happen in Terry Jones' business or personal life that would have called into question his reputation, character, or integrity with respect to his business dealings with the refineries. (Tr. 56:20–57:20.)

10. In 1989 Jones Oil had 2,200 to 3,300 customers who regularly purchased petroleum products from Jones Oil; had a sales staff of 15 to 20; and sold its products in 23 states. (Tr. 48:18–53:25.) In the same year, Dun & Bradstreet, Inc., rated Jones Petroleum Company "3A1," which meant that Jones Oil had an estimated financial strength of $1,000,000 to $9,999,999 with a "high" composite credit appraisal. (Tr. 57:24–60:25; Ex. 9.)

### Events Prior to and During Execution of Search Warrant

11. IRS Special Agent Angelo Stennis disclosed to a confidential informant on January 31, 1990, that "a search warrant [is] going to be executed. Be cautious over the next several days, and if there [are] any problems that occur[ ] or anything that [you] perceive[ ] as a threat from anyone at Jones Oil, . . . let [me] know." *Jones I,* 898 F.Supp. at 1387. R. Lucchino worked for Jones Oil at one time and Plaintiffs suspect he is one of the two confidential informants. *Id.* at 1370 (finding 51).

12. Agent Stennis made this disclosure to one confidential informant because Stennis had a long-term professional relationship with the informant; Stennis viewed the informant as trustworthy, accurate, articulate, businesslike, and as someone who could be helpful in the future regarding any motor fuel excise tax problem; the informant had

relayed to Stennis on "several occasions" that he felt threatened by "people from Jones Oil; i.e., lawsuits that had been filed or drive-bys of his office"; and the informant had previously suffered an anxiety attack [2] while operating in an undercover capacity for Stennis. While the confidential informant did not indicate a desire for revenge against Jones Oil while Stennis worked with the informant, "[h]e [3] was obviously not happy with Jones Oil or Terry Jones." (Tr. 593:3–594:23; 595:12–19; 596:1–11; 597:2–20; 597:2–8.) Stennis testified that the informant never mentioned contacting the media, and if he had, Stennis would have ended their relationship. (Tr. 598:1–19.) Agent Stennis does not recall talking to the confidential informant on February 1, 1990, the day of the IRS seizure at Jones Oil. (Tr. 599:1–5.)

13. As previously found in *Jones I*, 898 F.Supp. at 1370–72, John Sims (a car dealer who operated his business from an office adjacent to the offices of Jones Oil) taped part of a telephone call he received from Ricardo A. Lucchino in the afternoon of February 1, 1990, during which "R. Lucchino 'just basically took credit for the actions that had happened that morning . . . talking about how he or his people . . . notified the media to come down with their cameras. . . .' " *Jones I*, 898 F.Supp. at 1371 (finding 67). Terry Jones, who also listened to the tape, "remembered that R. Lucchino 'was divulging the fact that the IRS was there, and that he took full credit for them being there and the investigation.' " *Id.* at 1372 (finding 69). "According to Jones, R. Lucchino also 'took full credit for the press being there, [he] was elated.' " *Id.* at 1372 (finding 70).[4]

14. During the day-long execution of the IRS search warrant on Jones Oil Company on February 1, 1990, Terry and Patricia Jones told the agents that taking the company's computers would destroy their business.

As a result, the Joneses were authorized to purchase a new computer that day and copy the company's files, including customer lists, onto the new computer in order to keep Jones Oil "in business." The files they were allowed to copy onto the new computer "contained the critical information necessary to conduct sales" and to allow Jones Oil to continue to operate. (Tr. 71:25–74:12.) Of the 300 boxes of documents taken from Jones Oil by the IRS agents, "none of them" were critical to the continuing operation of Jones Oil Company. (Tr. 73:10–74:12.) Before the IRS began to transport the documents it had seized to Indiana, Pat Jones and various Jones Oil staff members were allowed to retrieve approximately half of the company's 1990 sales order forms, check registers, correspondence, and invoices from the filing cabinets the IRS agents had seized because the scope of the search warrant did not include 1990 records. (Tr. 182:2–183:23.) Between February 1990 and October 1991, Pat Jones and Jones Oil staff traveled three times to Indiana, where the IRS allowed them to retrieve records that exceeded the scope of the warrant and that were necessary for Jones Oil to continue operating. (Tr. 186:17–188:20.)

15. As previously established in this litigation, a television station that employed Michael McKnight, an investigative reporter, broadcast McKnight's videotaped news story of the IRS activity at Jones Oil during the evening news on February 1, 1990. *Jones I*, 898 F.Supp. at 1371.

16. The IRS does not try to attract media attention when it coordinates and performs searches; rather, the IRS attempts to be "inconspicuous." (Tr. 574:16–575:8.) When the media "appears during [a] search . . . they are a disruption and a distraction, and

---

2. Stennis testified on cross-examination that he did not recall this anxiety-attack episode until he was preparing for the damages trial during the week of trial. (Tr. 599:23–600:1.)

3. Agents Stennis and Tinsley were asked to refer to the confidential informant in the masculine gender during their testimony at trial.

4. During the liability trial, Sims' and Jones' testimony regarding the now nonexistent R. Lucchi-

no tape was ruled admissible for the truth of the matter asserted over a hearsay objection to Jones' testimony. This ruling was reaffirmed during the damages phase of trial. (Tr. 3:9–19; 193:7–202:9.) Essentially, I ruled that the evidence was admissible under the residual exception to the hearsay rule and that, in any event, the hearsay objection had been waived by the government when the government did not object to Sims' testimony about the tape.

... we don't encourage them to come." (Tr. 574:18–21.)

17. In 1990, the average daily traffic volume at the intersection nearest to the Jones Oil offices at 33rd and Cornhusker streets was 1,600 on the northern leg of the intersection; 28,800 on the eastern leg; 10,300 on the southern leg; and 35,000 on the western leg. The "peak" morning hour for traffic is from 7: 10 a.m. to 8:15 a.m. (Tr. 531:10–533: 10; Ex. 540.) One passerby who had performed pest-control services for Jones Oil in the past testified that, on the morning of the IRS seizure at Jones Oil, "people were just moving stuff out. It looked like they were moving. Looked like it was moving day." It was not until he saw the media account that night that the passerby realized something other than "moving day" had occurred at Jones Oil. (Tr. 581:13–582:17.)

18. Most of the refineries with which Jones Oil conducted business had representatives in Nebraska who worked out of their homes and served as area representatives. (Tr. 517:1–15.)

### Jones Oil After February 1, 1990

19. Jones Oil opened for business at 8:00 a.m. on February 2, 1990, and all but one of the Jones Oil Company sales staff reported for duty. Jones Oil had everything necessary to conduct business as usual the day after the IRS search—i.e., the computer database, working telephones, the business premises, and personnel. (Tr. 74:13–76:6.) Because Terry and Pat Jones had sent their employees home the previous day due to the IRS search and because the Joneses had seen a news account of the search and seizure on television the night of February 1, 1990, the Joneses held a sales staff "rah-rah-rah" meeting first thing on February 2, 1990, in an effort to convey to their employees that "we are going forward, we don't do anything wrong, and get in there and work hard, and we'll solve this problem." The news broadcast of the IRS raid on Jones Oil was a topic of discussion at the meeting, and one employee asked Terry Jones at that time why he did not tell the employees this was going to happen. (Tr. 75:14–20; 80:7–81:12; 426:12–17.)

20. Within "an hour or two" after opening its doors, Jones Oil received a multi-page fax from Triangle Refinery in Houston, Texas, canceling sales from terminals in five states. Triangle Refinery was one of the refineries with which Jones Oil previously had a credit arrangement that allowed Jones Oil to pull product from the common carrier pipeline on Triangle's behalf. Jones Oil previously had sales acknowledgments from Triangle promising that Triangle would sell Jones Oil a certain amount of product over a certain period of time at nine different terminals. The fax sent by Triangle to Jones Oil on February 2, 1990, consisted of copies of those acknowledgments, with the words "CANCELLED FEBRUARY 2, 1990" typed across each of them. (Tr. 76:7–77:20, 79:14–80:6; Exs. 44A–I.)

21. "[S]tarting almost immediately" after Jones Oil opened for business on February 2, 1990, the daily faxes the company always received quoting prices at various terminals "tended to thin out and not be available" and "[e]ventually disappeared." (Tr. 81:17–82:14.) Terry Jones testified that "starting almost immediately, there [were] telephone calls from various refineries to me or to my vice-president" stating "that when the IRS would write me a letter and say that I did nothing wrong, that they would be glad to get back in bed with me, but until such time, I was out of business so far as they were concerned." (Tr. 81:17–25; 125:2–8.)

22. Newspapers in Lincoln, Omaha, Grand Island, Beatrice, Norfolk, Kearney, and Nebraska City, Nebraska, carried news stories generated by the Associated Press about the IRS activity at Jones Oil on February 3, 4, and 8, 1990. (Tr. 86:19–87:13; Exs. 36–43.) After the initial television news account of the Jones Oil story, WOWT (the television station that broadcast the news account) repeatedly used file footage of the Jones Oil seizure on its advertisements. (Tr. 359:8–360:2.)

23. Whereas Pat Jones was not involved in the day-to-day management of Jones Oil prior to February 1, 1990, she spent 80 percent of her time performing "crisis management" at Jones Oil after that date, causing the Jones' apartment and check-collection business to "suffer[ ]." (Tr. 189:12–190:4.)

24. Although FirsTier did not cancel its credit arrangement with Jones Oil after the IRS search and seizure on February 1, 1990, sales at Jones Oil in February 1990 dropped approximately 80 percent from the previous month due to Jones Oil's inability to find "significant" customers after that date. (Tr. 82:21–83:15, 85:5–6; Ex. 58 & 58A.) According to analysis of Jones Oil's monthly gross sales compiled from monthly internally-prepared financial statements, Jones Oil's monthly gross sales in January, 1990, were $1,854,301, and February, 1990, sales were $356,316. (Tr. 208:17–211:10; Ex. 58 & 58A.)

25. After February 1, 1990, Jones Oil operated primarily on government contracts, which before that date had comprised only 10 percent of its business. Because Jones Oil no longer had access to terminals, it was required to perform these government contracts by getting product supply from other "jobbers" like itself and taking an additional price mark-up. (Tr. 83:16–85:25.) Jones Oil was never able to recapture the customers on its customer list after February 1, 1990, and the government contracts eventually became unworkable and had to be canceled due to the government's inability to pay in 30 days, as Jones Oil's private customers had always done. (Tr. 85:1–86:18.)

26. From November, 1988, to January, 1990, Jones Oil had average monthly gross sales of $1,285,415. From February, 1990, to December, 1990, Jones Oil's average monthly gross sales were $287,015. (Tr. 213:18–214:16; Exs. 58 & 58A.) When Jones Oil was engaged in "crisis management" after February 1, 1990, it "went from 50, 60 employees down to three or four or five." (Tr. 326:18–20.) During this time, Jones Oil moved from the offices it could no longer afford to the Jones' apartments, where Jones Oil was operated out of an apartment. (Tr. 438:15–25.)

27. Jones Oil's last day of business was December 3, 1990, and the company's books were officially closed on December 31, 1990. (Tr. 190:5–14.)

28. An insurance broker, Robert K. Marshall, who sought Mr. Jones' commercial insurance business in 1986 was able to obtain quotes from underwriters to present a proposal to Terry Jones at that time. When the same agent attempted to prepare a similar proposal in the summer of 1990, the agent was unable to obtain any quotes from the insurance companies he regularly contacted for such information. Five of the underwriters the agent contacted for quotes in 1990 asked the agent whether the insured was "the same Terry Jones, Jones Oil, that was in the media this year." These underwriters were located in the Lincoln and Omaha, Nebraska, area. (Tr. 159:24–160:8; 160:24–163:17; 167:4–17; 169:25–170:16.)

29. Prior to 1990, Jones Oil Company had been audited two or three times in the area of excise tax. The fact of such audits had never before led to adverse publicity regarding Jones Oil. (Tr. 523:6–25.)

### Expert Testimony Regarding the Failure of Jones Oil and Associated Monetary Damages

30. John N. Chapin, Jr., is the Managing Director of Litigation and Forensic Service Practice in the Midwest for KPMG Peat Marwick. He was formerly a principal at Coopers & Lybrand where he served as Partner in Charge of Litigation and Claims Services Practice in the Midwest. Chapin has a Bachelor of Science in business administration and an M.B.A. from the John L. Olin School of Business at Washington University in St. Louis. He also attended the Advanced Industry School of Banking and Finance at Rutgers University in New Jersey. Chapin is a certified fraud examiner and certified management consultant, and has authored numerous publications and presentations regarding financial analysis as it relates to damage claims, litigation decision-making, the litigation process, and computers. (Tr. 215:11–217:21; Ex. 74.) I found him to be very credible, and, in the main, I found his testimony to be convincing. Except for the issue of causation, and a few minor points, the government elected not to challenge much of Chapin's testimony on the valuation of the loss. The government called no expert to contradict Chapin.

31. As part of his occupation, Chapin conducts financial analyses related to damage claims of failed businesses, as well as industry and economic analyses of businesses. As part of these analyses, Chapin studies business conduct within certain industries and

examines the viability of businesses through review of sources of income, cash flows, markets, and future plans and programs. (Tr. 217:23–218:23.)

32. Chapin performed a financial analysis of Jones Oil Company based upon financial records and other documents provided to him by Terry Jones, as well as information he gathered from Terry Jones and Jones Oil's accountant. (Tr. 218:24–219:23.) Based upon this analysis, Chapin reported findings and conclusions concerning the value of the loss of Jones Oil Company and the potential reasons for its demise or failure. (Tr. 221:10–223:224:6.)

33. In association with John Chapin, Terry Jones provided information on 21 factors relevant to business failure as those factors applied to Jones Oil. (Tr. 88:9–23; 215:11–14; Ex. 539A.) Chapin began using these factors in 1990 based upon his experience in analyzing companies that have failed. (Tr. 237:13–238:1.) The court's findings regarding each of these factors as they applied to Jones Oil immediately prior to the IRS actions against Jones Oil appear below:

a. *Technology:* There has been virtually no change over time in the composition of the product being sold—gasoline. (Tr. 89:8–24.) This product is stable and in continuous demand. (Tr. 228:21–22.)

b. *Changes in the Competitive Environment:* Jones Oil's method of doing business (purchasing the lowest-priced product based on daily prices and selling the product to the highest-paying customers) enabled Jones Oil to be profitable by offering the lowest price among its competitors. Thus, there were no changes in the competitive environment during 1989 and 1990 that affected Jones Oil's ability to be profitable. (Tr. 89:25–91:1.)

c. *Sensitivity to Economic Conditions:* Because Jones Oil's customer base was so diverse, a failure of one market segment to purchase fuel at a particular time would have had no effect on the company's overall productivity. (Tr. 91:2–19.)

d. *Eroding Profit Margins:* Jones Oil did not have eroding profit margins or sys-temic problems with the purchase and sale of petroleum products that would have affected the company's profitability during 1989 and 1990. (Tr. 91:19–92:12.)

e. *Government Regulation or Change in Taxing Structure:* Any government regulation or tax structure change which may have been imposed at the relevant time would have applied to the entire oil distributorship industry, so this factor would have had no effect on Jones Oil's ability to remain a viable operation after February, 1990. (Tr. 92:13–93:4.)

f. *Fluctuation in Raw Material Prices:* The refineries from whom Jones Oil purchased its product sold their product at the same relative price at any given time, and any price difference between refineries was based on supply and demand. Jones Oil's marketing strategy "took advantage of the people that wanted to get rid of that product." (Tr. 93:5–24.) Further, Jones Oil did not purchase raw materials; it purchased products and jobbed them. (Tr. 230:24–231:1.)

g. *Environmental Litigation:* Jones Oil was not involved in any environmental litigation in the relevant time frame. (Tr. 93:25–94:7.) An environmental review had been done of all the Jones' gas stations and properties. (Tr. 231:7–11.)

h. *Product Liability Litigation:* Jones Oil was not involved in any product liability litigation in the relevant time frame. (Tr. 94:8–17.)

i. *Loss of Key Employees:* From 1989 to 1990, Jones Oil did not lose key employees. (Tr. 94:18–95:1.) While Jones Oil lost three sales people in the mid–1980's who went to work for another oil company, Rock Port Oil, Jones Oil's profits remained constant. (Tr. 137:14–139:5.) Ricardo Lucchino, a former Jones Oil employee, went to Rock Port in 1988. At that time, Jones Oil and Rock Port began competing for telemarketers. (Tr. 157:1–10.) Based on Chapin's experience of evaluating sales

organizations, Chapin opined that Jones Oil did not suffer abnormal employee losses which would have impacted its business. (Tr. 231:23–232:7.)

j. *Poor Labor or Management Relations:* Terry Jones' relationship with his employees was good during the relevant time frame. Jones Oil was a nonunion shop and there were "no contracts or strikes" that affected Jones Oil. (Tr. 95:2–15.)

k. *Limited Source of Supply or Supplier Failure:* Jones Oil did not suffer a lack of supply during the relevant time period, and because Jones Oil purchased from a variety of suppliers, if one "was down for some reason or another, it had no effect" on Jones Oil. (Tr. 95:16–96:2.)

l. *Long–Term Supply Contracts at Significantly Above Market Price:* Jones Oil entered into supply contracts based on quantity, not price, and the price fluctuated daily. Therefore, this factor did not affect Jones Oil. (Tr. 96:3–13.)

m. *Poor Credit Rating or High Cost of Funds:* Jones Oil's Dun & Bradstreet credit rating has consistently been "3A1." (Tr. 96:14–97:7; Exs. 9 & 10 (D & B credit reports for 1986 & 1989).)

n. *Poor Cash Management and Inadequate Cash Flows:* Prior to February 1990, Jones Oil had no difficulties with cash management, as Terry Jones "spent [his] entire life working in that area." (Tr. 97:8–16.)

o. *Dependence on Few Sales Persons:* Just prior to February 1990, Jones Oil had 15 to 20 sales people and did not have any "unusual dependence on a few sales people." (Tr. 97:17–98:4.)

p. *Decrease in Market Share:* Jones Oil's market share was dependent upon the price it chose for its product. Petroleum products like those sold by Jones Oil were very price elastic, meaning that Terry Jones could greatly increase his market share simply by lowering his price a quarter to half cent per gallon. Thus, market share was in Jones Oil's control to a large extent. (Tr. 98:5–99:8.)

q. *High Turnover of Sales Force:* In 1989 and early 1990, Jones Oil had some new sales employees who would leave the company "very quickly." However, "if they were good, they didn't leave" and they became "long-time employees" who made high salaries. (Tr. 99:9–100:7.) While Jones Oil experienced turnover of employees, the rate of turnover remained constant from year to year. (Tr. 144:17–145:13.)

r. *Deteriorating Financial Condition of Customers:* Because Jones Oil's customer base was so diverse—including government, farmers, corporations, and institutions—the deteriorating financial condition of one type of customer would have "no effect." (Tr. 100:8–19; 236:17–23.)

s. *Dependence on Few Customers:* Terry Jones' business philosophy has always been that "[y]ou don't ever put yourself into a position where you depend upon one customer for supporting your organization because if you lose that one customer, you'll lose that business. . . . I have turned down business when the customer was too large for our organization." (Tr. 100:20–101:9.) Chapin found that "no customer accounted for a double[-]digit percentage of the sales of Jones Oil Company." (Tr.236:15–16.)

t. *Volatile Product Mix:* Unlike electronic products, for example, the product life of petroleum products is infinite. (Tr. 101:10–22.)

u. *Credit Policies—Too Strict or Lenient:* Jones Oil required financial statements from its customers, bank references, and, if their customers' credit was "in any way tenuous," Jones Oil required a letter of credit. (Tr. 101:23–102:16.)

34. Based upon the above 21–factor analysis, John Chapin opined that there was "nothing . . . either externally or internally" prior to February 1, 1990, which made it likely that Jones Oil was in imminent danger of going out of business. (Tr. 227:12–25.)

35. After the February 1, 1990, IRS activity at Jones Oil and the news accounts and

drop in sales that occurred in the weeks immediately following the IRS activity, the following factors from the above 21–point analysis were affected:

a. *Limited Source of Supply:* Jones Oil's supply of product ceased because "all of the refineries got in touch with me or my organization and would not sell us product on credit, so we had no supply." (Tr. 104:17–23.)

b. *Long–Term Supply Costs at Significantly Above Market Price:* All long-term supply contracts with Jones Oil were canceled. (Tr. 104:24–105:6.)

c. *Inadequate Cash Flow to Support Operations:* Without sales, Jones Oil could not meet payroll, leading Jones Oil to have inadequate cash flow to support operations. (Tr. 105:14–22.)

d. *Decrease in Market Share:* After February 1, 1990, and the publicity and decrease in sales which followed, Jones Oil "had no market share." (Tr. 106:3–6.)

e. *High Turnover of Sales Force:* When Jones Oil could no longer get supply of petroleum products, there was a high turnover of its sales force. (Tr. 106:7–12.)

36. After his review of the above factors as they applied to Jones Oil, John Chapin found "nothing other than the release of confidential taxpayer information to a confidential informant, anonymous phone call, and the resulting publicity that led to the events that caused the demise of Jones Oil." (Tr. 240:10–15.)

37. In response to the government's "*Daubert*-like" causation objection to this testimony, the court found that: "[B]efore-and-after economic analysis, using the rule[-out] hypothesis, is customarily employed in economic fields to endeavor to establish causation." (Tr. 240:16–19.) Therefore, the court found that the approach used by Chapin was generally sound.

38. John Chapin also valued and computed the loss of the demise of Jones Oil Company, concluding that Jones Oil suffered the following damages:

| | |
|---|---|
| $4,516,083 | Loss of Jones Oil Company future-valued as of Jan. 31, 1998 |
| $ 78,854 | Overpayment of petroleum taxes to Tennessee, future-valued to Jan. 31, 1998 |
| $ 565,356 | Loss due to required liquidation of real property valued to Jan. 31, 1998 |
| $ 24,760 | Loss due to required liquidation of personal property of J .O. Holding, Inc., future-valued to Jan. 31, 1998 |
| $ 524,766 | Loss in Jones Publishing, future-valued to Jan. 31, 1998 |
| **$5,709,819** | **TOTAL DAMAGES AS OF JAN. 31, 1998** |

The method by which John Chapin derived the above figures is described below in separate paragraphs. (Exs. 65D (demonstrative exhibit only), 65E, 65E–1.)

39. *Loss of Jones Oil Company:* Of the three generally accepted approaches to valuing a business, Chapin chose the income or discounted cash flow approach. The income approach includes capitalization of earnings or discounted cash flow, whereas the cost or asset approach includes asset value, and the market comparable approach includes comparable sales. Because Jones Oil's financial statements reflected a history of profitable operations and evidenced Jones Oil as a business which relied on people rather than capital assets to generate cash flows, Chapin rejected the cost or asset approach to valuation. Because Chapin was unable to locate comparables to Jones Oil for the relevant time frame, Chapin also rejected the market approach. (Tr. 241:8–242:10; Ex. 65E, App. B.)

Chapin calculated Jones Oil's cash flow from operations for fiscal years 1988 and 1989, applied a weighting factor of two to the cash flow for 1989 in order to account for recency, averaged those numbers, and reached an expected business cash flow in 1990 of $498,784. Chapin then applied a 22.7 percent capitalization rate [5] to that expected

---

5. Chapin reached this capitalization rate by taking the 30–year government bond rate of 7.9 percent, taking the historical average rate of long-term government bonds (4.7 percent) and for common stocks (12.1 percent), and determining a common stock differential (7.4 percent) that should be added to the government bond rate. He then determined a Beta for the oil and gas industry (.8) and multiplied it by the common stock differential to reach 5.9 percent. Chapin then added to that percentage the government bond rate, which is a (relatively) risk-free rate, in order to reach a risk-free plus equity risk rate of 13.8 percent (7.9 + 5.9). Chapin then took the

cash flow to value Jones Oil Company as of October 31, 1989 (the company's year end closest to the unlawful disclosure). The product of the capitalization rate was $2,197,288; that is, the market would pay roughly 4.4 times the positive annual cash flow of $498,784 to buy a business like Jones Oil. Chapin then future-valued this amount to January 31, 1998, by increasing the amount monthly by the rate of return Jones would have received had he invested that sum in "Baa" bonds [6]. The compounding factor was based on daily compounding at the monthly "Baa" bond rate. This future-value calculation resulted in a value of Jones Oil at January 31, 1998, of $4,516,083. (Ex. 65E & 65E-1.)

40. *Overpayment of Petroleum Taxes to Tennessee:* Jones Oil was required to pay oil excise taxes to the State of Tennessee during 1989 and 1990. Under Tennessee state law, refunds for overpayments of oil excise taxes must be claimed within a certain time period. Because of the IRS seizure that occurred at Jones Oil on February 1, 1990, and the "damage control" activities of Jones Oil employees after that date, Jones Oil was unable to file its tax refund claim on time and such claim was denied as untimely. In his damages calculation related to the denial of Tennessee oil excise taxes for the 1989 and 1990 tax years, Chapin future-valued to January 31, 1998, the refund claimed for each of those tax years, again using the appropriate "Baa" bond rate, reaching a total of $78,854.17 for the 1989 and 1990 tax years combined. (Tr. 248:11–250:19, 322:5–326:24; Ex. 65E, App. C.)

41. *Loss Due to Liquidation of Real Property:* As discussed above, J.O. Holding was the holding company that owned Jones Oil. J.O. Holding owned certain property that was used almost exclusively by Jones Oil in order to conduct its business operations, but these properties were carried on the J.O. Holding balance sheet. The properties that were liquidated as a result of the demise of Jones Oil were a gas station supplied by Jones Oil at 56th and Holdrege Streets and the office space used by Jones Oil at 33rd and Adams [7] Streets in Lincoln, Nebraska. With regard to the latter property, the Joneses could not afford the mortgage payments, taxes, insurance, and maintenance costs as Jones Oil "lost more and more sales people."

In order to calculate the total real estate damages resulting from the sale of these properties, Chapin started with the fair market values of each property as reflected in appraisals prepared by a qualified appraiser as of a given date before the disclosure. He then determined the tax-assessed value on that same date. Next, he determined the tax-assessed value on the date of sale. He next determined the sales price for each property.[8] He then assumed that the ap-

---

common stock rate and found a differential to apply to Jones Oil to account for its small size (17.8 percent), reaching a 5.7 percent small company differential. From that, Chapin determined that the market would require a return on equity of 19.5 percent (13.8 + 5.7). Therefore, he multiplied 19.5 by the appropriate mix of debt and equity for the type of business involved, projected growth, and converted the figure into a pre-tax capitalization rate of 22.7 percent. (The formula (simplified by carrying the decimal to 4 places) is this: 100% (maximum cost of money (finance charge) necessary to acquire a business) divided by 22.7% (cost of money (finance charge) necessary to acquire this business) = 4.4052 (factor) × $498,784 (annual earnings) = $2,197,288 (amount needed to acquire business).) Chapin opined that the 22.7 percent capitalization rate was indicative of a small, privately-held, family business with a reasonably good earnings history over the past 15 years. Chapin has seen capitalization rates as high as, and higher than, 22.7 percent in his experience. (Tr. 306:23–309:25.)

6. `Chapin selected the "Baa" bond rate because an investment-grade bond rate of "Baa" was appropriate for the type of business conducted at Jones Oil. According to Chapin, "[a] lower rate would have been a junk bond rate, and [Jones Oil's] history of earnings over time eliminated that. We also used the BAA rate for our future value activity because had Mr. Jones been successful in selling his business, he would have had that capital. It would have been the rate at which he could have reasonably expected to invest it and obtained a return." (Tr. 310:12–311:3.)

7. Throughout the damages trial, this location was referred to as 33rd and Cornhusker.

8. Chapin testified that he assumed and was told that the sales were arms-length transactions (Tr. 317:10–14; 318:20–319:2) and the government presented no evidence to the contrary.

praised value would have increased or decreased at a rate equal to the increase or decrease in assessed value. Both properties enjoyed an increase in assessed value. Therefore, for each property, he multiplied a factor representing the percentage of increase times the original appraised value to determine the market value of that property at the time of sale. He then compared the sale price of each property to the market value of each property.[9] After that comparison was made, Chapin found that the properties had each sold for less than they were worth. Thus, the holding company had suffered a loss of $55,101 on one property and $280,384 on another. These loss figures were then future-valued (using the Baa bond rate) to January 31, 1998, resulting in a total loss of $565,356 on that date for both properties combined. (Tr. 250:20–253:9, 320:22–322:4, 374:13–375:4; Ex. 65E, App. D.)

42. *Loss Due to Liquidation of Personal Property of J.O. Holding, Inc.:* Personal property used by Jones Oil (but carried on the J.O. Holding balance sheet) to conduct its business—such as desks, chairs, and business office equipment—was sold at auction after the demise of Jones Oil. Chapin calculated the value of this loss by comparing the book value (cost less depreciation) of the equipment ($26,720) with the sale price of the equipment ($13,375), and determined that the loss was $13, 345. Using the Baa bond rate, he valued that amount as of January 31, 1998, reaching a total of $24,760. (Tr. 253:10–254:5; Ex. 65E, App. F.)

43. *Loss in Jones Publishing:* Chapin opined that the amount of invested capital that had been used to develop Jones Publishing, a start-up company, was a loss related to the demise of Jones Oil because the cash being generated by Jones Oil for use by Jones Publishing was no longer available after February 1, 1990. "There was no cash being developed in the oil company business because of its demise that would have helped in Jones Publishing, and other sources, other creditors, other investors[,] were unable to be found." (Tr. 255:4–7.) Because Jones Publishing failed, Chapin took the amount of paid-in capital and loans from other sources that had been contributed to Jones Publishing and figured the investment that was lost in Jones Publishing was $275,447. Chapin future-valued that amount to January 31, 1998, which totaled $524,766. Because Jones Publishing was a start-up company, he did not attempt to value its potential successes or speculate on its earnings. (Tr. 254:2–255:24; Ex. 65E, App. E.)

### Out–of–Pocket Losses to Terry Jones

44. Besides calculating damages for the above five categories, Chapin future-valued to December 31, 1997, trade and bank debt with respect to funds Terry Jones claims he paid personally after Jones Oil failed. In making these computations, Chapin did not opine whether Jones was entitled to reimbursement for this amount or whether it properly constitutes damages. Chapin calculated $754,345 as the amount of liability that existed upon dissolution of Jones Oil that was either paid personally by Terry Jones or remains outstanding. In reaching this total, Chapin applied the appropriate "Baa" bond rate to sums paid or owed to various oil companies and applied interest of $65.20 per day to a sum owed to FirsTier Bank.[10] (Tr. 256:24–260:2; Ex. 510 (demonstrative only).)

45. Terry Jones also testified that he personally had a loan from First Federal Sav-

---

9. For example, one property was appraised by a competent appraiser in 1988 for $265,000. That same property had an assessed value of approximately $92,500 in 1988. At or near the time of sale, the assessed value had increased to approximately $98,600. The assessed value therefore increased over time by a factor of approximately 1.0665. (Chapin apparently used a rounding convention to arrive at the precise factor.) Chapin then multiplied the factor times the 1988 appraised value ($265,000) to arrive at the actual value of the property at the time of sale, or $282,631. He then compared the actual value of $282,631 with the sale price of $227,530 to determine the loss of $55,101. (Ex. 65E, App.D.)

10. Specifically, Terry Jones testified he personally paid or owes the following sums to the following entities:

| | |
|---|---|
| MFA Petroleum | $ 5,000 |
| Valero | $ 2,500 . |
| Ashland | $ 5,000 |
| Total Petroleum | $ 12,000 |
| Marathon Oil | $221,576 |
| FirsTier Bank | $269,387 |

(Tr. 327:1–338:14; Exs. 45A, 45B, 47A, 47B, 48A, 48B, 49A, 49B, 50B, 52, 53, 54, 510 (demonstrative).)

ings & Loan that he used as working capital for his various enterprises. Terry and Patricia Jones borrowed $1,000,000 personally, pledging as collateral the equity in their apartments. The Joneses then loaned the money to J.O. Holding, which disbursed funds as needed to the Jones' various corporations. The Joneses entered into an agreement with First Federal regarding repayment of the loan after the demise of Jones Oil. While J.O. Holding has returned to the Joneses $712,000, there remains on the books of J.O. Holding a balance of $271,000 due to Terry and Patricia Jones personally. Terry Jones claims he is entitled to compensation for this amount as a result of the demise of Jones Oil. (Tr. 338:15–340:13; Ex. 55.)

### Physical & Emotional Injury: Loss of Reputation

46. Terry Jones' family has lived in Lincoln, Nebraska, for four generations. Jones and his "entire family" views having a reputation for honesty and integrity as "one of the most important things there are .... your reputation is about the only thing you can take to your grave." (Tr. 345:8–16; 350:16–23.) Jones was a high school scholar, graduated from the University of Nebraska in Lincoln, and had conducted business and been involved in the community for many years. (Tr. 357:21–25; Exs. 4, 5, 34.)

47. Patricia Jones is a native Nebraskan who moved to Lincoln in 1961 and was married to Terry Jones in 1963. (Tr. 401:12–402:11;411: 1–5.) Prior to February, 1990, she had numerous social connections in Lincoln and was professionally, socially, and philanthropically involved in the community. (Tr. 411:6–414:2.) The Jones' reputation for honesty and integrity was something Pat Jones viewed as being a vital aspect of the Jones' businesses and of her faith. (Tr. 415:1–18.)

48. Terry and Pat Jones had always dreamed of early retirement and they worked hard to achieve that goal. Prior to 1990, the Joneses had listed Jones Oil Company for sale with that goal in mind. (Tr. 417:12–20.)

49. Although Terry Jones had surgery in 1985 to correct an aortic aneurism and replace a heart valve that had a congenital defect in it, Jones was in good physical and emotional health prior to February, 1990. (Tr. 351:1–24; 379:10–382:18.) Likewise, Patricia Jones was in excellent mental health. (Tr. 416:13–417:2.)

50. When Terry Jones viewed the McKnight news story on television the night of February 1, 1990, he "thought [he] was finished."

> I thought we were all done. On the other hand, I had fought all my life. I came from the other side of the tracks from a financial standpoint. I had a very fine father and mother, but we never had any particular money, so I worked very hard. I worked 40 years to build these organizations, and I thought I had lost them immediately, and then when I c[a]me to in two or three days, I started working very, very hard to try and salvage everything that I could possibly salvage... I was so embarrassed and so humiliated....
>
> ....
>
> I had spent my entire life being so proud of what I did and what I had become and what my wife and I—I have got the very, very, very best wife in the whole world. I felt so bad about the fact I hurt her, and I did.

(Tr. 357:9–20; 362:16–20.)

51. At the time Terry and Pat Jones saw the television newscast, Mike McKnight had the reputation of covering "high profile-type" stories in his "Cover Story" segment in which McKnight "always looked like he was going around digging for dirt." "Cover [S]tory to Lincoln, Nebraska, was probably like ... 60 Minutes was to the nation." (Tr. 420:1–11.) To Pat Jones, the Jones' appearance on Cover Story meant they were "now guilty until proven innocent." (Tr.424:2–5.)

52. Prior to the Mike McKnight newscast, Terry and Pat Jones had never been the subjects of adverse publicity. (Tr.420: 12–16.)

53. After the news account appeared on television on February 1, 1990, the Joneses suffered several social and financial consequences. The Joneses noticed that long-time acquaintances would "look the other way" when they saw the Joneses in public. (Tr. 358:6–12.) Social invitations from people the

Joneses perceived to have been friends "came to a screeching halt" after February 1, 1990. (Tr. 435:7–436:5.) The Jones' cleaning lady called them on the night of the IRS seizure, stating that she had seen the Joneses on television that evening, and she would not be coming back. (Tr. 361:15–362:9.) Business supplies for which Jones Oil had a charge account for 25 years were suddenly delivered COD. (Tr. 427:6–17; 428:13–19.) People with whom Patricia Jones had previously developed business contacts became nonresponsive and critical. (Tr. 429:12–430:9.) The Joneses were forced to refinance their apartments through friends. (Tr.358:14–23.)

54. Dr. Chester Paul, a vascular and burn surgeon at St. Elizabeth's Hospital in Lincoln, has treated Mr. Jones' medical conditions over the years and he and his wife have been long-time friends of the Joneses. (Tr. 375:17–22; 376:12–378:1.) After February 1, 1990, Dr. Paul observed Terry Jones gradually become reclusive, withdrawn, and "wast[ed] away" from not eating, leading Dr. Paul to conclude that Terry Jones was clinically depressed. (Tr. 384:8–386:4.) Dr. Paul found it necessary to prescribe anti-depressant medication to Jones as late as February of 1997. (Tr. 394:21–395:12.) Dr. Paul did not think that Jones had required or received antidepressant medication until after the disclosure. (Tr. 395:2–9.)[11] Dr. Paul did not observe "anything that would look like or appear to be a clinical depression in Terry Jones prior to February of 1990." (Tr. 394:17–20.)

55. After February 1, 1990, Terry Jones slept only four hours per night. (Tr. 360:14.) According to Pat Jones, after February 1, 1990, Terry Jones would lay awake at night and mutter "at least three or four times a night... I wish I were dead." (Tr. 439:4–9.) He quit showering and shaving. (Tr. 439:24.)

56. After February 1, 1990, Terry Jones lost his appetite, causing him to go from 185 pounds before the IRS seizure to 130 pounds in February, 1997, at which time he was hospitalized. (Tr. 360:8–361:10.) By February of 1997, seven years after the unlawful disclosure, Jones was "run[ ]down, emaciat-

ed, his protein mass was wasted, his immunity was bad, he couldn't breathe, he couldn't walk, he was purple-gray and anemic, and he got pneumonia and came in the hospital, and ... he was probably going to die." (Tr. 386:5–9, Testimony of Dr. Paul.) Jones was unable to breathe upon his admission to the hospital because his failure to eat caused him to lose muscle mass, including the muscles that enabled him to breathe. (Tr. 388:21–389:5.) After Jones was admitted into the hospital, Dr. Paul prescribed Prozac to treat Jones' clinical depression. (Tr. 387:22–388:11.)

57. After February 1, 1990, Pat Jones had trouble sleeping, questioned her deeply-held faith, and found it necessary to consult a psychiatrist after she had an emotional crisis. (Tr. 430:12–431:5.)

The IRS was in on Thursday, and that Mike McKnight show aired, the [C]over [S]tory aired Thursday night.... [O]n Saturday morning, I got up and knew I had to go to work to make up for Thursday that we lost, and I got in the shower and I ... replaying that whole event was so painful, I know I ended up on the floor of the shower just sobbing, and what brought me around was the cold water, and I remember crawling out and crawling into bed, and I stayed there. I stayed there the whole day. And when the sun started to set, I knew I was not going to make it through the night. I knew I would kill myself....

(Tr. 431:8–432:24.)

58. The Joneses no longer have any immediate plans to retire and they are now "essentially back to where [they] were in '63." (Tr. 436:19–23.) Although the Joneses have now prevailed on the liability portion of this litigation, they do not feel generally redeemed in the eyes of the public. "Those types of parties, those types of invitations that we had ... before have never resurfaced. Those friends of ours that knew in their hearts that we had done nothing wrong continued to support us and have to this day, but I don't—I don't think that we can ever be in the community the way we

---

**11.** Jones took Valium infrequently both before and after the disclosure, but he was not taking it on a regular basis. (Ex. 542, Deposition of J. Boman Bastani, at 13:2–13.)

were. We can never be whole." (Tr. 456:10–22.)

### Results of the Investigation

59. Leo Curry, an employee of Jones Oil, was prosecuted and pled guilty as a result of the IRS investigation which involved Jones Oil. Although the government may have been able to make a case against the Jones Oil corporation because of Curry's activities, the corporation was never charged. According to Agent Tinsley, "to pursue criminal charges against a company that was out of business and had no ability to pay a fine, were one imposed as the result of a successful conviction, was a waste of the government's time and resources." (Tr. 562:1–21.)

60. The Joneses first learned they were no longer personally under investigation during a deposition with Agent Tinsley as a part of this litigation on April 15, 1994. (Tr. 441:4–15.) The government decided that "they shouldn't be prosecuted." (Tr. 583:25–587:15.) Put simply, the government had no evidence of wrongdoing on the part of Mr. and Mrs. Jones.

61. At the conclusion of the civil examination which was being conducted concurrently with the criminal investigation of Jones Oil, the government made a refund to the plaintiffs. The way this refund arose is somewhat complex. Initially, the IRS identified a $3,000,000 civil deficiency that was issued on Jones Oil Company and J.O. Holding, Inc. (Tr. 563:21–564:2; 578:8–579:10.) Then the IRS issued "closing letters" on November 6, 1995, for both Jones Oil Company, Inc., and J.O. Holding, Inc., stating that the correct tax liability for each entity after all assessments had been made, corrected, and agreed to by all parties was $1,001,151 for Jones Oil Company, Inc., and $53,649 for J.O. Holding, Inc. These assessments were then netted against tax deposits and this resulted in a refund to the Joneses of approximately $415,000. (Tr. 622:7–623:10; Exs. 86, 87, 88.) Thus, in the end, it was the government that owed the plaintiffs.

### III. CONCLUSIONS OF LAW

I start with two observations. First, Terry Jones and Pat Jones have been grievously injured by their government. As a consequence, it is right that they be compensated to the full extent of their damages. Second, while an IRS criminal investigator made a mistake, he did so out of a sincere desire to protect a confidential informant during a complex multi-state criminal investigation. As a result, it would be unjust to read this opinion as a reason to demonize the agent or the IRS. With that said, I turn to the specific damage issues raised by this difficult case.

### A. The Proper Recipients of Damages are Terry and Pat Jones.

When I made my liability decision, I found "in favor of Plaintiffs and against the United States on the issue of liability." *Jones III*, 954 F.Supp. at 195. The plaintiffs seek liquidated, actual, and punitive damages for one disclosure pertaining to Jones Oil, Terry Jones, and Pat Jones.

Because of the complex, but perfectly legal, business arrangements of the plaintiffs, it is necessary to specify the proper recipients of any damage award. The plaintiffs are Terry Jones; Pat Jones; Jones Publishing, Inc., a corporation; Jones Oil Company, Inc., a corporation; J.O. Holding, Inc., a corporation; and Jones Petroleum Company, now known as Jones Apartments, a partnership.

Terry Jones and Pat Jones owned the stock that controlled J.O. Holding. J.O. Holding in turn controlled the remainder of the corporations. It also appears that Terry and Pat Jones from time to time operated a partnership known as Jones Apartments and from time to time that partnership may have been the nominal holder of the stock in J.O. Holding. These business arrangements are further complicated by other factors. For example, Jones Oil Company has ceased doing business and may have been dissolved and J.O. Holding was the nominal owner of certain property that was liquidated as a result of the demise of Jones Oil Company.

Given these complexities, the following question arises: What person or entity is entitled to receive the damages assuming that an award is appropriate? The plaintiffs have answered this question in their brief, and the government has not objected.

After careful consideration, I adopt the position of the plaintiffs. Any award resulting from the demise of Jones Oil Company will be paid jointly to Terry Jones and Pat Jones, individually, as their interests may appear. Any award resulting from emotional distress damages sustained by Terry Jones will be paid to Terry Jones, individually. Any award resulting from emotional distress damages sustained by Pat Jones will be paid to Pat Jones, individually.

### B. "Return Information ... with respect to" Pat Jones Was Disclosed.

While conceding for the sake of the damage trial that "return information" of Terry Jones and Jones Oil was improperly disclosed, the government now argues that there is no evidence that "return information" related to Pat Jones was disclosed. I disagree.

The United States has liability if an IRS agent unlawfully "discloses any ... return information *with respect to a taxpayer.*" 26 U.S.C. § 7431(a) (emphasis supplied). The statute does not state that liability arises only if the taxpayer is identified by name. In fact, "return information" can be "any ... data ... with respect to the ... possible existence ... of liability ... of any person ... for any tax ... or offense." 26 U.S.C. § 6103(b)(2)(A). Because of the broad definition of "return information," the IRS tells its agents that a prohibited "disclosure may be either direct or indirect." *Jones I,* 898 F.Supp. at 1380 (quoting Internal Revenue Service Manual).

The disclosure here was "with respect to" Pat Jones, as well as Terry Jones and Jones Oil. The disclosure (essentially that a search warrant was going to be executed at Jones Oil), when interpreted in the context of all the discussions between Stennis and the informant, proclaimed that IRS criminal investigators were focusing on Jones Oil and its owners, including Pat Jones.

First, Pat Jones filed joint individual tax returns with Terry Jones. A spouse who files a joint tax return is potentially liable for the taxes owed by the other joint taxpayer. *See, e.g., Estate of Gryder v. Commissioner of Internal Revenue,* 705 F.2d 336, 339 (8th Cir.) (spouse failed to meet her burden under 26 U.S.C. § 6013(e) and was therefore civilly liable for under-reported income on joint return; husband had been criminally prosecuted and convicted for filing false tax returns), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983). Thus, any disclosure pertaining to the investigation of Terry Jones was also "with respect to" Pat Jones, who was, at the very least, jointly liable for any unpaid taxes that he owed.

Second, not only did Pat Jones face civil liability regarding the joint tax returns of Terry Jones, she also faced criminal liability for the acts of Jones Oil because she was so intimately involved with Jones Oil. She owned 51 percent of Jones Oil. She was also an officer of the corporation. Furthermore, she was director of the corporation. Still further, she functioned as an "administrative assistant" to Terry Jones, the president of Jones Oil. Thus, any unlawful disclosure pertaining to Jones Oil would also be "with respect to" Pat Jones since she had serious potential criminal exposure for the acts of Jones Oil under the tax laws. *See, e.g., United States v. White,* 671 F.2d 1126, 1128 & 1134 (8th Cir.1982) (affirming corporation manager's criminal conviction; the manager conspired to impede the ascertainment of corporate income taxes; he was responsible for the failure to properly disclose the true nature of the corporation's revenues and expenses).

Third, at the time of the disclosure, the government believed that Pat Jones was a target of the investigation. For example, the government knew that Pat Jones was married to Terry Jones, that she was "a vice president, secretary and the major stockholder of" Jones Oil, and the government revealed this information to the judge who issued the search warrant. (Liability Trial, Ex. 3A (Redacted Search Warrant Affidavit at 3).) Still further, in the search warrant affidavit the government implied that records showing illegal activity involving Jones Oil might be "relocate[d]" in a building where "Terry Jones' wife has an office." (*Id.* at 18–19.) In addition, the agent in charge of this investigation admitted that "*there wasn't any doubt ... this investigation involved* Terry and Pat Jones as joint taxpayers and Jones Oil Company." (Liability Trial Tr. 97:23–98:1 (emphasis added).) Thus, the government

knew or should have known that a wrongful disclosure "with respect to" Terry Jones or Jones Oil would also amount to a disclosure "with respect to" Pat Jones.

In summary, I find and conclude that the unlawful disclosure was "with respect to" Pat Jones, as well as Terry Jones and Jones Oil. The disclosure was not merely wrongful because it disclosed the impending execution of a search warrant at Jones Oil. It was also wrongful because it disclosed to the informant the specifics of a criminal investigation of the Jones family. Such a disclosure had the capacity to, and in fact did, implicate Pat Jones in the public mind when the informant published it. Therefore, she is entitled to all the damages caused her personally by the disclosure.

## C. Because They Are Entitled to Actual Damages, the Plaintiffs are Not Entitled to Liquidated Damages.

■ The law provides that liquidated damages are to be awarded if the plaintiffs did not sustain actual damages exceeding one thousand dollars. 26 U.S.C. § 7431(c)(1) (providing for the "greater of" liquidated damages in the sum of $1,000 for each disclosure or "actual damages" and, in the case of a willful disclosure or a disclosure caused by gross negligence, punitive damages, plus the costs of the action). Because I find that Jones Oil, Terry Jones, and Pat Jones each sustained actual damages in excess of one thousand dollars, I will not award liquidated damages to them.

## D. The Plaintiffs Have Proven Causation for Actual Damages.

I find and conclude that the unauthorized disclosure of tax return information caused actual damage to Terry and Pat Jones individually and as owners of Jones Oil Company.[12] There is no question that the plaintiffs suffered some damage as a direct result of the unlawful disclosure. For example, it is clear beyond question that Jones Oil failed as a direct result of the unlawful disclosure; that is, the disclosure caused a tip to the news media that in turn resulted in intense news coverage that destroyed Jones Oil. Despite the clarity of the evidence, the government continues to argue that the plaintiffs failed to prove "causation." I reject the government's arguments for the following reasons.

■ Taxpayers, like the plaintiffs, are entitled to "actual damages sustained by [them] *as a result of* such unauthorized ... disclosure." 26 U.S.C. § 7431(c)(B)(i) (emphasis added). There is no case law that establishes precisely what level of "causation" is required in order to recover "actual damages." In the absence of contrary case law, and applying the plain meaning of the words of the statute, I find and conclude that the common law elements of causation must be proven in order to recover "actual damages" under section 7431.

In general[13], common law "causation" has two elements. *See, e.g., Horn v. B.A.S.S.*, 92 F.3d 609, 611–12 (8th Cir.1996) (discussing cause in fact and proximate cause) (citations omitted); W. Page Keeton, *Prosser and Keeton on Torts* §§ 41 & 42 (5th ed.1984) (discussing causation in fact and proximate cause). First, the plaintiff must prove that the wrongful act in fact caused the harm; that is, the plaintiff must prove that "but for" the wrongful act, the harm would not have occurred. *B.A.S.S.*, 92 F.3d at 611–12. Sec-

---

**12.** This is not say, however, that the plaintiffs have proven causation for every dollar of their damage claim; that is, I now examine only the question of whether the plaintiffs proved the fact of damage. Later, I examine the question of the quantum of damages.

**13.** It is not possible to precisely articulate the common law meaning of causation. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 32, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (" 'Cause,' although irreducible in its concept, could not escape the ruffles and decorations so generously bestowed: remote, proxi-

mate, direct, immediate, adequate, efficient, operative, inducing, moving, active, real, effective, decisive, supervening, primary, original, contributory, ultimate, concurrent, causa causans, legal, responsible, dominating, natural, probable, and others. The difficulty now is in getting any one to believe that so simple a creature could have been so extravagantly garbed.' ") (quoting Leon Green, *Rationale of Proximate Cause* 135–136 (1927)). Nevertheless, an appropriate decision on causation involves the evaluation of "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535, 103 S.Ct. 897.

ondly, the plaintiff must prove that the harm was a " 'reasonable and probable [foreseeable] consequence' " of the wrongful act; that is, the plaintiff must prove that, considering other potential causes, it is sensible to impose liability upon the defendant. *Id.* (quoting *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 865 (Mo.1993)).

With this preface in mind, I turn to the specific questions of causation raised by the government. In general, the government argues that the plaintiffs failed to prove that the disclosure in fact caused damage and that the plaintiffs failed to prove that the disclosure was the proximate cause of damage.

### 1. Factual Cause

I find and conclude that the factual cause of the plaintiffs' damages was (1) the unlawful disclosure to the informant that "a search warrant [is] going to be executed ... at Jones Oil," *Jones I,* 898 F.Supp. at 1379, and (2) the informant's subsequent telephone call to a television reporter to "come down [to Jones Oil] with [his] cameras." *Id.* at 1371. I further find that the informant who received the unlawful disclosure was Rick Lucchino (R. Lucchino) and that Lucchino or others at his direction made the call to the investigative reporter. I further find that "but for" the unlawful disclosure to R. Lucchino, the investigative reporter would not have known of the search and the damage would not have occurred.

The government argues that the evidence is insufficient to prove the identity of the person who received the disclosure. Moreover, the government argues that the evidence is insufficient to establish that the person who received the disclosure informed the investigative reporter of the execution of the search warrant. Still further, the government argues that the execution of the search warrant would have been discovered in any event. Also, the government argues that the plaintiffs' damage expert simply assumed causation, and there are possibly other reasons that the plaintiffs suffered damage. As a consequence, the government argues that the plaintiffs have failed to prove that the disclosure was the factual cause of their injury. I am not persuaded by the government's arguments.

■ I begin by recognizing that the government refused to reveal the identity of the informant, and, at the government's insistence, the court prohibited the plaintiffs from discovering the identity of the informant. *United States v. Jones Oil Co.,* 60 F.3d 831 (8th Cir.1995) (table), 1995 WL 408251 (sustaining refusal to provide unredacted copy of search warrant affidavit); *Jones v. United States,* 869 F.Supp. 747, 749–50 (D.Neb.1994) (same). *See also Jones I,* 898 F.Supp. at 1367–68 n. 7. (noting government's objection to question put to Stennis by the plaintiffs' counsel during trial regarding whether Stennis had a conversation with Lucchino concerning the service of the warrant). As a result, I will not allow the government to use the informant privilege as both a shield and a sword. *See, e.g., United States v. Workman,* 138 F.3d 1261, 1264 (8th Cir.1998) (defendant would not be allowed to assert that he relied upon advice of attorney, and then prohibit inquiry into the substance of that advice; "[t]he attorney client privilege cannot be used as both a shield and a sword"). Thus, the uncertainty surrounding the identity of the informant arises because of the assertion of the government's privilege and that uncertainty is, therefore, not properly attributed to the plaintiffs.

### (a) R. Lucchino Received the Disclosure.

■ The evidence proves that R. Lucchino was the informant who received the disclosure. We have both direct and circumstantial evidence that proves the point.

We know from Stennis that he made the unlawful disclosure to an informant on the afternoon of January 31, 1990. *Jones I,* 898 F.Supp. at 1367–68 (findings 24–26). We also know that the next day, after the warrant was executed that morning, R. Lucchino was recorded by his brother-in-law and best friend John Sims (Sims) "divulging the fact that the IRS was [at Jones Oil], and that he took full credit for them being there and the investigation." *Id.* at 1372 (finding 69). Indeed, in four separate telephone calls on the day of the search, beginning shortly after the search warrant was executed and continuing until the afternoon, R. Lucchino or his brother S. Lucchino displayed an intimate knowledge of the government's activities in search-

ing Jones Oil. *Id.* at 1370–72 (findings 52, 60–70). Moreover, we also know that a few days before the search R. Lucchino cryptically told Sims "that there was something in the works with ... Terry or ... Jones Oil ... something was going to happen." *Id.* at 1372 (finding 72).

Although denying that he received the disclosure, we know that R. Lucchino admitted talking to the "federal people," such as Tinsley and Stennis, prior to February 1, 1990. *Id.* (finding 79). The plaintiffs have also proven that R. Lucchino was a former employee of Jones Oil who left the firm on less than amicable terms prior to the IRS investigation. *Id.* (finding 72). Lucchino had a financial incentive to harm Jones Oil since he worked for a competitor and he had left Jones Oil after Jones Oil claimed that he misappropriated proprietary information and gave it to the competitor. *Id.* (findings 74 and 75). We also know that at least one of the informants had previously been employed by Jones Oil. *Id.* at 1366 (finding 17).

In summary, the circumstantial evidence must be evaluated in light of the direct evidence of what R. Lucchino and his brother did and said while the search warrant was being executed. When we put this evidence together, the greater weight of the evidence establishes that it is more probable than not that R. Lucchino was the informant who received the unlawful disclosure.

**(b) R. Lucchino Called the Reporter.**

■ Next, I am persuaded that R. Lucchino (or someone acting at his direction, such as his brother) called Mr. McKnight, the investigative reporter, and persuaded him to come to the scene of the search. I arrive at this decision based upon the following evidence.

McKnight testified that around 9:00 a.m. he received a telephone message from a male that alerted him to a newsworthy event at Jones Oil. Specifically, the reporter was given a "tip that something was going on." *Id.* at 1371 (finding 56).

Shortly after the search began at about 7:00 a.m., R. Lucchino's brother, S. Lucchino, called Sims at his home. S. Lucchino had sold insurance to Jones Oil, but had lost the

account when his brother left the firm. *Id.* at 1370 (finding 51). Sims worked at an office adjacent to Jones Oil. S. Lucchino told Sims that he "was going to miss the fun [that] was going on at Jones Oil" and Sims should "[g]et to work." *Id.* at 1370–71 (finding 52).

During the mid-morning, R. Lucchino called Sims and was "gloating." *Id.* at 1371 (findings 60–61). Later that afternoon, R. Lucchino again called Sims. He wanted to know "if things had calmed down ... if there was a news crew there, still there...." *Id.* (finding 63).

Then, in the afternoon, Sims called R. Lucchino. Sims taped a part of the conversation. Later that evening, Sims allowed Terry Jones to listen to the tape.

Sims recalled that during the taped portion of the telephone call, R. Lucchino "just basically took credit for the actions that had happened that morning ... talking about how he or his people ... notified the media to come down with their cameras...." *Id.* (finding 67). Terry Jones recalled that R. Lucchino "divulg[ed] the fact that the IRS was there, and that he took full credit for them being there and the investigation." *Id.* at 1372 (finding 69). Furthermore, according to Terry Jones, R. Lucchino "took full credit for the press being there" and he "was elated." *Id.* (finding 70).

In summary, it is obvious that R. Lucchino (or someone acting at his direction) notified McKnight of the execution of the search warrant. I arrive at this conclusion because, among other reasons, (1) it is more probable than not that R. Lucchino was the informant who received the unlawful disclosure; (2) a male called McKnight and tipped him off; (3) the informant's brother, S. Lucchino, made a statement proving that he knew about the search shortly after it began; and (4) R. Lucchino, having a motive to harm Jones Oil, admitted to his brother-in-law and best friend that he was responsible both for the IRS investigation and the media attention.

**(c) The Government's Hearsay Objection is Not Valid.**

■ The government objected[14] to the testimony of Terry Jones regarding what R.

---

**14.** The objection was made during the liability trial and renewed again during the damage trial.

Lucchino had said to Sims when Sims secretly tape recorded their conversation on the day of the search. The tape itself was unavailable because Sims' wife had destroyed it later that same evening, but not before Sims had allowed Terry Jones to listen to the tape. R. Lucchino did not testify at trial. The government argued that the testimony about what Lucchino said was hearsay because he did not testify at trial and because his deposition was available.

The government conceded (Tr. 197; Liability Trial Tr. 47–48) that the plaintiffs had given notice that they intended to rely upon the residual exception to the hearsay rule when offering the testimony about R. Lucchino's statement. *See* Fed.R.Evid. 807 (second sentence). The question then became whether the testimony about what R. Lucchino said was: (1) "evidence of a material fact"; (2) "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts"; and (3) "the general purposes of the[ ] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence." Fed.R.Evid. 807(A)–(C). I found that all three of these prerequisites for admission of the statement had been satisfied. I now explain my reasons for that ruling in greater detail.[15]

As to the first criteria, everyone agrees that R. Lucchino's tape-recorded statement to Sims and Terry Jones' subsequent listening to, and recitation of, the statement[16] is evidence of a "material" fact. Fed.R.Evid. 807(A). The evidence goes to the heart of this case. The statement proves an unguarded contemporaneous admission of R. Lucchino, to his best friend and brother-in-law, that he caused the IRS search and that he notified the media of the search.

Secondly, R. Lucchino's deposition is not "more probative" than the trial testimony of Terry Jones about what R. Lucchino said during a tape-recorded statement shortly after the incident occurred. To the contrary, Terry Jones' trial testimony is the more probative.

Relying upon the words of Rule 807(B), the government argues[17] that Terry Jones' statement of what R. Lucchino said is not "more probative on the point ... than any other evidence which the proponent can procure through reasonable efforts." The government bases this assertion on the fact that R. Lucchino was deposed and that deposition testimony was available for use at trial. Moreover, in that deposition, R. Lucchino denied he was told about the government's intent to seize records at Jones Oil. The

Note, however, that the objection was limited to the testimony of Jones about the tape-recorded statement. The government did not object to Sims' testimony about the same statement. Nor did the government object to Sims' testimony about other statements that S. Lucchino or R. Lucchino had made to him earlier in the day.

15. I also found that the government had waived the objection when the government did not object to Sims' testimony about the taped statement. (Tr. 201–202.) I reiterate that ruling now.

16. The government suggests that when Jones recounted what he heard on a tape-recorded statement of what R. Lucchino said to Sims, Jones' testimony was double hearsay; that is, since Jones was not a participant to the conversation, the statement of R. Lucchino to Sims is one level of hearsay and the tape recording of that same statement is another level of hearsay. If there are two levels of hearsay, they are both admissible under the residual exception to the hearsay rule for the reasons articulated in the text.

17. The government relies upon *Netterville v. State of Missouri*, 800 F.2d 798, 801 (8th Cir.1986) (evidence was inadmissible because it was not the most probative evidence procurable on the point for which it was offered). Suffice it to state that the facts of this case are not similar to the facts of *Netterville*. The opinion in *Netterville* notwithstanding, many other Eighth Circuit cases support the use of the residual exception to the hearsay rule. *See, e.g., United States v. Earles*, 113 F.3d 796, 800 (8th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *United States v. NB*, 59 F.3d 771, 776–78 (8th Cir.1995); *United States v. Grooms*, 978 F.2d 425, 427–28 (8th Cir.1992); *United States v. Calkins*, 906 F.2d 1240, 1244–45 (8th Cir.1990); *United States v. St. John*, 851 F.2d 1096, 1098–99 (8th Cir.1988); *United States v. Roberts*, 844 F.2d 537, 544–47 (8th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988); *United States v. Kail*, 804 F.2d 441, 449 (8th Cir.1986); *United States v. Renville*, 779 F.2d 430, 439–41 (8th Cir.1985); *United States v. Cree*, 778 F.2d 474, 477–78 (8th Cir.1985). Nevertheless, the outcome of all these cases are highly fact-specific. Thus, reliance on specific cases is not very helpful.

government's argument, although vigorously presented, is not persuasive.

Using the informant privilege, the government hamstrung the plaintiffs from taking an effective deposition of R. Lucchino. Since the plaintiffs could not force Stennis to disclose the name of the person who received the unlawful disclosure, Lucchino could profess ignorance of the entire matter knowing that the plaintiffs could not discover the truth from the government. Thus, the deposition testimony of R. Lucchino is inherently suspect.

Next, although both sides tried to subpoena R. Lucchino to testify at trial, neither side could find him. *Jones I*, 898 F.Supp. at 1372 (finding 78). Thus, I had no opportunity to see how R. Lucchino would have reacted to the trial testimony that directly impeached him.[18] What I do know persuades me that he was not truthful during the deposition. *Id.* (finding 79).

For example, during the deposition Lucchino avoided numerous questions because of a suspicious lack of memory, once lamenting that "I don't remember what I did yesterday." *Id.* Furthermore, in his deposition Lucchino did not deny the conversation with Sims. (Liability Trial Ex. 101, at 20:10–19.) On the contrary, when specifically asked on two occasions whether he denied having had such a conversation, Lucchino twice stated: "No, I didn't say that. I said I did not remember." (*Id.* 20:13–14 & 18–19.)

In contrast to Lucchino's evasive deposition, I was able to see and hear the credible live testimony of Jones during trial. In short, the live trial testimony of Jones, when weighed against the highly suspect deposition testimony of an absent witness, is the more probative.[19]

Still further, R. Lucchino's tape-recorded statement was made in an unguarded moment to his brother-in-law and best friend as the critical event was occurring. Sims testified at the liability trial, and recounted, without objection, his recollection of the taped

statement. Although Sims' recollection of the statement is not identical to Terry Jones' recollection, it is very close. Thus, we have unbiased corroboration for the fact and nature of the statement recounted by Jones. As a result, the live trial testimony of Lucchino's best friend and brother-in-law makes Jones' similar trial testimony more probative than Lucchino's suspect deposition.

Finally, I am satisfied that the admission of the statement is in accord with the general purposes of the rules of evidence and the interests of justice. The use of the statement "secure[s] fairness ... to the end that the truth may be ascertained and [the] proceeding[ ] justly determined." Fed.R.Evid. 102. The truth is that R. Lucchino received the unlawful disclosure and tipped the media, and the tape evidence proves it.

### (d) "But For" Cause

██ While phrased in a variety of ways, the government essentially argues that the disclosure to Lucchino was not the "but for" cause of the injury to the plaintiffs. In other words, the government argues that the evidence is insufficient to prove that "but for" the disclosure, the injury would not have occurred. Summarized and condensed, the government has three arguments in this regard.

Initially, the government asserts that the news media would have found out about the search in any event and therefore the disclosure did not harm the plaintiffs. Next, the government argues that there is no connection between the disclosure and the conclusion by John Chapin, the damage expert, that the disclosure caused damage to Jones Oil. In other words, Chapin's analysis was flawed because it assumed causation. Thirdly, the government argues that the failure of Jones Oil could have occurred because of a variety of "other reasons," such as (1) the plaintiffs were the subject of a criminal investigation and that fact (as opposed to the disclosure) could have caused the demise; (2)

---

**18.** Had Lucchino appeared at trial, his out-of-court statement recounted by Jones and Sims, both of whom testified at trial, could have been used to impeach him even if the statement was hearsay. Fed .R.Evid. 613.

**19.** I note that Lucchino would not waive his right to read and sign the deposition. (Ex. 101 at 24:20–25: 1). The original deposition submitted to me did not contain his signature, although it contained a place for his signature and that of a notary public. (*Id.* at 26.)

the seizure of the firm's records could have caused the demise; and (3) the suppliers may have had motivations other than the raid for canceling business with Jones Oil. I am not persuaded by any of these arguments.

The government asserts that the act of seizing records, occurring as it did at the intersection of busy streets during the day by IRS agents wearing raid jackets, would have surely been discovered and publicized by the news media even if the disclosure had not been made. This argument is far too speculative to be convincing.

To begin with, I am not persuaded that the news media would have learned of the raid had the disclosure not occurred. Except for the one entirely unlawful disclosure, the IRS personnel and U.S. Attorney's office were silent.[20] The search warrant affidavit was sealed. None of the plaintiffs were charged with crimes. An eye witness, who drove by the Jones building while the raid was occurring, testified that he did not think anything unusual was taking place. He simply thought it was "moving day."

In addition, the tip to McKnight brought to bear upon the plaintiffs a highly intense focus that would not have occurred, even assuming that the media would have later learned about the raid through proper channels. McKnight's "Cover Story," replete with video coverage of the search as it was taking place, was widely viewed with more interest than a dry news account. "Cover [S]tory to Lincoln, Nebraska, was ... like 60 Minutes was to the nation." (Tr. 420:1–11.) Indeed, the television station that broadcast the program was so taken with this story that it used the report in its advertisements. Thus, it is wrong to assume that the news media would have focused upon the raid with the same intensity had the media learned of the event in the normal course of events.

Regarding the government's second argument, I do not believe that Chapin's analysis was flawed because it assumed causation. In fact, Chapin followed an accepted methodology in his field. He examined Jones Oil and the related market in great detail before the unlawful disclosure and tip and after the unlawful disclosure and tip. In so doing, he carefully reviewed every facet of the Jones Oil business and related market.[21]

By ruling out other causes for the failure of Jones Oil, Chapin was able to pinpoint the unlawful disclosure and tip as the factual cause of the injury, as opposed to some other factor. Put simply, this "rule out" method does not assume causation; it tends to prove it. *See, e.g.,* Federal Judicial Center, *Reference Manual on Scientific Evidence* 512 (West 1994) (discussing the question of whether there is causal link between the alleged misconduct and the measured damages in antitrust cases; stating that "experts sometimes compare market conditions in a period affected by the misconduct with conditions in another period, during which the misconduct is known to be absent").

Moreover, Chapin had direct evidence of causation to buttress his analysis. For example, Terry Jones testified that "starting almost immediately, there [were] telephone calls from various refineries to me or to my vice-president" stating "that when the IRS would write me a letter and say that I did nothing wrong, that they would be glad to get back in bed with me, but until such time, I was out of business so far as they were concerned." (Tr. 81:17–25; 125:2–8.) Absent the disclosure, tip, and resulting "Cover Story," there is no reason to think that these refineries would have started demanding on February 2, 1990, a favorable letter from the IRS as a condition for doing business with Jones Oil.

20. The government relies upon *Johnson v. Sawyer*, 120 F.3d 1307, 1326–29 (5th Cir.1997). The *Johnson* case deals with a much different situation; that is, it involves a press release about public court proceedings. In that case, the disclosure was partly lawful and partly unlawful. Suffice it to state that there was only one disclosure in this case, and that disclosure was entirely unlawful. Thus, the causation problem presented in *Johnson* is not present here.

21. I am unpersuaded by the government's citation to *Barrett v. United States*, 100 F.3d 35, 40 (5th Cir.1996), where the court noted that an expert took "causation as a given." As explained in the text, Chapin did not take causation as a given. Moreover, there was direct evidence of causation that supported Chapin's analysis. Finally, the facts of *Barrett*, involving as they do a circular letter that contained both lawful and unlawful information, present much different causation issues.

With regard to the third argument that Jones Oil might have failed because of a variety of "other reasons," I remain unconvinced. Although the plaintiffs were the subject of a criminal investigation, they were never charged and, except for the disclosure and tip, the investigation was kept confidential. Thus, the investigation is not the cause of the demise.

Moreover, although the government seized all their records, the business was fully operational the day after the search. Terry and Pat Jones were able to copy, with the government's help, all their records, including computer records. Thus, the absence of records did not cause the demise.[22]

Finally, a few suppliers may have had other motivations for canceling their business. It is impossible, however, to believe that Jones Oil had a thriving business on January 31 based upon numerous contented suppliers, but most of these same contented suppliers just happened to cancel their business on or shortly after February 2 for "other reasons." In this regard, it is important to remember that from November, 1988, to January, 1990, Jones Oil, a company that prospered with a very high credit rating, enjoyed average monthly gross sales of $1,285,415. By contrast, in the eleven months following the disclosure, the average monthly gross sales fell to a paltry $287,015. In fact, the sales fell to $356,316 in February of 1990. Something dramatic happened, and that something was the unlawful disclosure and tip.

In summary, the plaintiffs easily proved "but for" causation. In contrast, the government's arguments lack meaningful evidentiary foundations and are too speculative to be convincing.

## 2. Proximate Cause

The plaintiffs proved that the unlawful disclosure proximately caused the tip to McKnight, the publicity, and the resulting damage. Two points should be made.

First, the obvious purpose of prohibiting disclosures is to protect the personal and business reputations of taxpayers. In other words, a reasonable IRS agent would know that "even without an actual conviction, the suggestion of criminal activity can transform and devastate an individual's life." *Diamond v. United States*, 944 F.2d 431, 434 (8th Cir.1991). Thus, it would have been generally foreseeable to a reasonable IRS agent that the disclosure in this case, which obviously revealed a pending criminal investigation of the plaintiffs, could have far-reaching and devastating consequences to Jones Oil and the principals of that company.

Second, and more specifically, it should have been foreseeable to Stennis that Lucchino harbored bad feelings for Terry Jones and that Lucchino might seek to harm Jones Oil with the information provided by the disclosure. To the extent the government argues that Agent Stennis could not have foreseen that Lucchino would call the media, and, therefore, the disclosure was not the "reasonable and probable consequence" of the wrongful act, I reject the argument.

Stennis knew (or should have known) that Lucchino had left Jones Oil to join a competitor after Jones accused Lucchino of taking proprietary information. For example, Stennis stated during the liability trial that he knew the informants had "crossed paths with Mr. Jones." *Jones I*, 898 F.Supp. at 1386. While obviously not identifying Lucchino as one of the informants, Stennis nevertheless admitted that he knew these transactions were "ugly." *Id.* Plainly put, it was obvious that there was "bad blood" between Lucchino and Jones. *Id.* at 1372 (findings 73–77).

While Stennis might not have foreseen that Lucchino would call McKnight, Stennis (and a reasonable agent in his position) would have foreseen that Lucchino might use the disclosure to harm Jones and that is all

---

22. The government relies upon a letter the plaintiffs' lawyer wrote to the IRS shortly after the seizure stating in part that "the record seizure has made it difficult to conduct business, and, in fact, has basically put the Company out of business." (Ex. 506.) The government reads too much into this letter. First, it does not state that the seizure of records, as contrasted with the publicity surrounding the seizure of records, was the cause of the failure. Second, the letter was written before the lawyer or the Joneses knew the true facts about the unlawful disclosure and tip. Third, the letter does not disprove the undisputed fact that Jones Oil was fully operational the day after the search. Fourth, this would not be the first time a lawyer was wrong.

the element of "proximate cause" requires. As our Court of Appeals has made clear, "'the law does not require precision in foreseeing the exact hazard or consequence' which in fact transpires; it is sufficient 'if what occurred was one of the kind of consequences which might reasonably be foreseen.'" *Griggs v. Firestone Tire & Rubber Co.,* 513 F.2d 851, 861 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (quoting *Comstock v. General Motors Corp.,* 358 Mich. 163, 99 N.W.2d 627, 636 (1959)) (footnote omitted).

### E. The Plaintiffs are Entitled to Actual Damages for the Failure of Jones Oil.

The plaintiffs claim that the unlawful disclosure and resultant demise of Jones Oil Company caused them damage. This claim has six facets.

I find and conclude that the plaintiffs are entitled to recover damages in the amount specified by their damage expert for the demise of their operating business, for the sale of real estate, and for the sale of personal property. Specifically, I find that the unlawful disclosure was the factual and proximate cause of these damages and that these damages have been proven with sufficient certainty.

I also find and conclude that the plaintiffs are not entitled to damages related to the Tennessee tax refund claim because that claim is too speculative. With regard to the Jones Publishing damage claim, I find and conclude that the evidence is insufficient to establish that the disclosure was either the factual or proximate cause of the loss. Finally, I find that the plaintiffs are not entitled to "out-of-pocket" expenses because those damages are inconsistent with the theory used by their own expert. An explanation of these decisions is set forth below.

### 1. Damages for the Operating Business

■ Jones Oil Company had become highly successful in a business that especially depended upon the perception that it was run by people of unquestioned honesty. With a spotless Dun & Bradstreet rating, Jones Oil Company was able to buy the daily excess capacity of petroleum products from a wide variety of refineries. Jones was able to make these purchases on credit at very low prices relative to prices charged by the refineries that had no excess capacity. In turn, Jones Oil was able to resell that excess capacity to various petroleum retailers who were paying the highest prices in a given geographic region.

The success of Jones Oil Company pivoted upon the trust that Jones Oil had established with the refineries. Trust was essential to the refineries' willingness to deal with Jones Oil; that is, because the refineries gave Jones Oil access to their production facilities with little or no oversight, the refineries had to be sure that Jones Oil was trustworthy. In effect, the refineries gave Jones Oil the "key to the store" on the assumption that Jones Oil and its owners were above suspicion.

When Jones Oil was pictured on "Cover Story," the various local representatives of the refineries were exposed to publicity that directly called into question the integrity of the business practices of Jones Oil. In turn, the day following the raid Jones Oil received numerous cancellations of agreements with refineries. These cancellations continued, and by the end of December of 1990, Jones Oil ceased doing business. All of this was foreseeable to a reasonable agent who contemplated the disclosure of tax return information regarding the company.

In summary, the unlawful disclosure resulted in the ruination of the company's reputation for honesty, and without that reputation, the company was destroyed. The unlawful disclosure was therefore the factual and proximate cause of the failure of Jones Oil.

■ What was the value of Jones Oil on or about February 1, 1990? The plaintiff commissioned John N. Chapin, Jr., the Managing Director of Litigation and Forensic Service Practice in the Midwest for KPMG Peat Marwick, to determine the damages. Of the three generally accepted approaches to valuing a business, Chapin chose the income or discounted cash flow approach.

Chapin calculated Jones Oil's cash flow from operations for fiscal years 1988 and 1989, and reached an expected positive cash flow in 1990 of $498,784. Chapin then ap-

plied a capitalization rate to that expected cash flow to value Jones Oil Company as of October 31, 1989, the fiscal year end of the company closest to the date of the unlawful disclosure. He arrived at a value of $2,197,288. Chapin then future-valued this amount to January 31, 1998, by increasing the value of the business monthly by the rate of return the plaintiffs would have received had they invested that sum in "Baa" bonds. This future-value calculation resulted in a value of Jones Oil at January 31, 1998, of $4,516,083.[23]

Aside from a dispute on the issue of causation, the government has raised no serious objection to the method used to value the business. For example, Chapin testified that his analysis was submitted to an expert employed by the government, and, after that review, the government's expert expressed no serious objection to the capitalization rate used by Chapin. (Tr. 316:12–24).[24] Indeed, the government did not call an expert to contest any part of Chapin's analysis regarding the damage calculations for Jones Oil.

In summary, I conclude that Chapin's analysis is correct regarding the value of Jones Oil Company and the damages flowing from the demise of that business. I will therefore award the plaintiffs damages for the destruction of their operating business. The judgment for these damages will be computed this way: (1) $4,516,083 (representing the damages as January 31, 1998); (2) plus a sum equivalent to interest on $4,516,083 at 5.232 percent[25], computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment).

### 2. Damages for Tennessee Taxes

██ The plaintiffs claim that in the wake of all the adverse publicity, they were distracted from submitting a claim for a refund on taxes that had been paid to the State of Tennessee by Jones Oil Company. The evidence reveals that the time for filing a refund for these taxes ran out during the relevant period of time. Therefore, the plaintiffs seek damages for that refund.

As the finder of fact, I reject the plaintiffs' claim for damages relating to the refund. Simply put, the evidence does not persuade me that the plaintiffs in fact suffered a loss. Even if I assume that the failure to file a refund request was caused by the unlawful

---

**23.** The government suggests that the plaintiffs are not entitled to prejudgment interest and the government implies that Chapin's present-value calculation is in effect a prejudgment interest calculation. I disagree with the premise of the government's argument that Chapin is suggesting an award of prejudgment interest. The government destroyed an operating business that would have continued to generate profits but for the disclosure. Chapin's analysis picks a valuation date in 1990 and then brings that value to the present in an attempt to explain what the value of the business would have been had it not ceased operating. The present-value component of Chapin's analysis is an appropriate recognition of the fact that the plaintiffs have been deprived of a successful *operating* business. The Baa bond rate is equivalent to the rate of return one would expect in businesses like Jones Oil. Thus, whether the plaintiffs sold or kept Jones Oil, they would have had an investment that generated a rate of return approximating that bond rate on the date judgment is entered for them, and that is what they have been deprived of by the disclosure. If instead of a business that was destroyed, a Baa bond had been destroyed, no one would contend that the damages would be limited to the face amount of the bond. On the contrary, the owner would be entitled to the face amount of the bond, plus the rate of return on the bond, until judgment is entered. The

same is true for an operating business. Moreover, no matter how one characterizes Chapin's present-value analysis, the failure to award this component of damage would result in something less than an award of "actual damages" called for by the statute.

**24.** I examined Chapin to satisfy myself as to the validity of his analysis. (Tr. 305–316). Among other things, this inquiry included questions regarding the appropriateness of the capitalization rate which he used to determine the loss, as well as his use of the Baa bond rate which he used to future-value the loss. As noted earlier, I found Chapin very credible and well-informed.

**25.** This equals the judgment rate of interest effective as of February 1, 1998. *See* Memorandum from Patricia A. Poplinger, Chief, Analysis and Policy Staff, Administrative Office of the United States Courts, to All Clerks, United States Courts (Feb. 5, 1998) (certifying interest rates to be charged pursuant to 28 U.S.C. § 1961 and 40 U.S.C. § 258(e)(1)). I have elected to use this rate of return after January 31, 1998, because the evidence fails to reveal what the Baa bond rates were after January 31, 1998. As previously noted, *see* n. 23, the plaintiffs were deprived of an operating business and they are thus entitled to be compensated as if their business had operated to the date of judgment.

disclosure, on this record it is pure speculation to conclude that the plaintiffs would have been successful on the merits of that disputed refund claim.

### 3. Damages for Sale of Real Estate

■ The plaintiffs claim that their holding company was forced to sell real estate leased to Jones Oil when Jones Oil failed; that is, when Jones Oil failed, the holding company had no further use for the property. Using a comparison of assessed values and appraised values, the sale of the real estate generated a loss, according to Chapin. Valued as of January 31, 1998, that loss was $565,356.

The government has not seriously challenged the method used by Chapin to determine the real estate loss. Moreover, I find that Chapin's damage analysis is trustworthy. Still further, I find that the holding company would not have been forced to sell the gas station or the office building leased to and operated by Jones Oil had Jones Oil survived. Lastly, it would have been foreseeable to a reasonable agent that if Jones Oil failed, the assets used to operate the business would be liquidated. I therefore find that the real estate loss was factually and proximately caused by the unlawful disclosure that resulted in the demise of Jones Oil.

In summary, I will award the plaintiffs damages regarding the sale of real estate. The judgment for these damages will be computed this way: (1) $565,356 (representing the damages as of January 31, 1998); (2) plus a sum equivalent to interest on $565,356 at 5.232 percent, computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment).[26]

### 4. Damages for Sale of Personal Property

■ When Jones Oil failed, it had personal property that was no longer needed. Therefore, the personal property was sold at auction. Chapin compared the book value of that personal property with the auction price of the personal property, and determined that there was a loss, valued on January 31, 1998, of $24,760.

Because the personal property would not have been sold at a loss if Jones Oil had not failed and because the loss of this type was a foreseeable consequence of the disclosure, I find that the factual and proximate cause of the loss was the wrongful disclosure. Moreover, the government has not seriously challenged Chapin's damage estimate and I find his analysis to be convincing.

In summary, I will award the plaintiffs damages regarding the sale of personal property. The judgment for these damages will be computed this way: (1) $24,760 (representing the damages as of January 31, 1998); (2) plus a sum equivalent to interest on $24,760 at 5.232 percent, computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment).[27]

### 5. Damages for Jones Publishing

■ The plaintiffs claim that when Jones Oil failed, the positive cash flow from the business was lost and, in turn, they were unable to invest that cash flow into Jones Publishing Company, a new business. As a consequence, the plaintiffs claim Jones Publishing failed. With the closing of Jones Publishing Company, the plaintiffs lost the money they had loaned to or invested in Jones Publishing.

While I assume that the plaintiffs lost what they invested or loaned Jones Publishing, I am not persuaded that the unlawful disclosure "caused" this loss. I have two reasons for this decision.

First, there is no persuasive evidence that Jones Publishing would have succeeded had Jones Oil not failed; that is, one cannot say that "but for" the disclosure, the plaintiffs would have recovered their investment and loans in Jones Publishing Company. Jones Publishing Company was a "start-up" business with no history. We have no hard evidence that Jones Publishing was viable before the disclosure or was likely to become viable if the disclosure had not taken place.

---

**26.** *See* n. 25.

**27.** *See* n. 25.

Accordingly, the plaintiffs have not convinced me that they would have recovered their investment in, and loans to, Jones Publishing if the disclosure had not occurred.

Second, I am not persuaded that it would have been foreseeable to a reasonable agent that disclosure of tax return information regarding an established business would result in the failure of a separate "start-up" business. In other words, I am not persuaded that the unlawful disclosure was the proximate cause of the Jones Publishing loss.

### 6. Damages for "Out-of-Pocket Expenses"

██ The plaintiffs seek to recover trade and bank debt that Terry Jones claims to have paid personally after Jones Oil failed. In other words, over and above the value of the loss of Jones Oil set by Chapin, the plaintiffs seek additional expenses allegedly flowing from the demise of Jones Oil. It is important to note that Chapin, the plaintiffs' damage expert, did not support Terry Jones' claim for additional expenses. (Tr. 256:24–259:17; Ex. 510 ("The theory supporting [Terry Jones'] claims differs from the theory supporting the claims [supported by Chapin]. As such, it would not be appropriate to adjust our report to reflect these claims.").)

I do not agree that the plaintiffs are entitled to the losses categorized as additional trade and bank debt that Jones claims to have paid personally after Jones Oil failed. I find and conclude that these additional damages are inconsistent with the damage valuation approach used by Chapin, and I therefore reject the claim.

I arrive at this conclusion because, among other reasons, the income approach to the value of Jones Oil used by Chapin assumes that these debts had been paid or reserves had been made for these debts. When I award the plaintiffs the sum suggested by Chapin for the loss of Jones Oil, I am of necessity assuming that these other debts should have (or could have) been paid by the corporation. This is because the monthly cash flows used by Chapin to compute the income approach to value accounted for this debt before the income was computed. Hence, Chapin's analysis assumed that the

trade and bank debt was a liability that had already been counted when valuing Jones Oil.

Let me give an example.[28] Jones claims that after Jones Oil failed, he had to pay Marathon Oil roughly $90,000, plus he still owed them money. (Filing 188, Order on Final Pretrial Conf., at 2.) If we award $2,197,288 as of approximately February 1, 1990, for the value of Jones Oil as Chapin's analysis suggests, such an award presupposes that the trade debt incurred had been paid or a reserve for payment had been established. This is true because the trade debt to Marathon should have been included in the cost of goods sold on the monthly financial statements. Thus, the income valuation approach used by Chapin assumes that the debt was paid (if the statements were compiled on a cash basis) or a reserve for payment had been established (if the statements were compiled on an accrual basis). In any event, Jones Oil should have had sufficient money to pay the trade debt if Chapin's income approach to valuation of the business was correct.

The fact that Jones personally paid the trade debt means that the stockholders took too much cash from Jones Oil, and thus paid themselves before they paid their suppliers, leaving the business solvent, but relatively cash poor. While it was perfectly legal to do this, the diversion of these funds was not caused by the IRS. More importantly, had the stockholders not diverted these funds, Chapin's analysis, predicated upon the financial statements prepared by Jones Oil, assumes that there should have been enough cash in Jones Oil to pay the trade debt without Jones having to pay the debt personally.

Put another way, if Jones Oil had been sold in February of 1990, it would have sold for approximately $2,197,000. But the income approach to valuation used by Chapin assumes that the buyer would have bought Jones Oil for $2,197,000 *only* if there was enough cash to pay the trade debt which had accumulated in the ordinary course of business; that is, the income approach to valuation (frequently called the capitalization of

---

**28.** The examples discussed in the text are not the only illustrations that could be used to explain the inconsistency between Chapin's method and Terry Jones' additional claim.

*earnings* approach) assumes that the buyer is paying a multiple of the *net* (before tax) income stream. For example, when we examine the balance sheet for January 31, 1990, the receivables ($1,785,732) exceed the total current liabilities ($1,298,546). (Ex. 58.) Someone would be willing to buy this positive income stream. However, no one would pay for these receivables without also deducting from the sale price the cost (total current liabilities) of generating these receivables.

The same is true for bank debt. The bank debt primarily represents account receivable financing. Thus, the bank debt equates to sales on the monthly statements. If the sales figures on the monthly statements are correct, then the sales should have resulted in payment of the bank debt (if the statements were on a cash basis) or a reserve for payment should have been created (if the statements were on the accrual basis). Hence, the income approach used by Chapin assumes that the bank debt has been paid or a reserve for payment created. If the business lacked the cash to pay the bank debt, then, once again, Jones must have taken an excessive amount of cash from the business.

Finally, Jones also claims that he borrowed money from a bank to use as working capital for his various businesses. The proceeds from the working capital loan were disbursed to J.O. Holding, and the holding company then apparently put part of the working capital into Jones Oil Company. Terry Jones therefore claims that when Jones Oil failed, he was personally liable for the repayment of the working capital that had been borrowed and invested in Jones Oil Company.

I assume that what Jones states is true about the working capital loan. However, that loan represents in my view (and apparently in the view of his expert) a capital investment by Jones. This being true, when Chapin valued the loss of Jones Oil, the expert's value necessarily took into consideration the amount of invested capital (no matter whether categorized as debt or equity) that would be necessary to buy Jones Oil. Thus, when I award Jones and his wife over

4.5 million dollars for Jones Oil, I am also compensating Terry Jones for any capital (working or otherwise) that he would have invested in, or loaned to, the company as a principal.

In summary, I have adopted the method used by the plaintiffs' damage expert to value the loss of Jones Oil. I reject, as did his expert, Terry Jones' claim for additional "out-of-pocket" expenses for that same loss.

## F. Terry and Pat Jones are Entitled to Damages for Emotional Distress.

No one could have listened to the testimony of Terry and Pat Jones without concluding that they have suffered greatly. Thus, the question starkly presented by this case is whether I may compensate Terry and Pat Jones for the pain and suffering they experienced as a direct and proximate result of the unlawful disclosure.[29]

After careful consideration, I conclude that the law authorizes me to compensate Mr. and Mrs. Jones for their pain and suffering, and I will do so. The reasons for this decision are set forth below.

### 1. Section 7431(c) Allows Recovery of Emotional Distress Damages.

First, I start with the words and structure of the statute. 28 U.S.C. § 7431(c). The statute reads in pertinent part as follows:

Damages.—In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—

(1) the greater of—

(A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

(B) the sum of—

---

**29.** The plaintiffs also assert that their reputations were damaged, and I do not doubt their assertion. However, they have not suggested that there is a factual or legal difference between a

claim for pain and suffering (emotional distress) and a claim for loss of reputation. Indeed, the plaintiffs treat the two concepts interchangeably. For purposes of this case, so do I.

(i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

(ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

(2) the costs of the action.

*Id.*

There is nothing in these words that precludes an award for pain and suffering. For example, the statute authorizes a broad range of damages, including liquidated damages of $1,000 for each disclosure, "actual damages," and "punitive damages." Linguistically, there is no limitation on the reach of "actual" damages, so long as that damage is "something that ... exists in fact." *Webster's Third New International Dictionary* 22 (1986) (defining "actual").

Moreover, the structure of the statute suggests that pain and suffering have not been excluded. The word "actual" appears to distinguish one category of damage from two other categories—liquidated and punitive. This structure therefore does not suggest the word "actual" was intended to mean only "out-of-pocket" damage. On the contrary, the word "actual" distinguishes that type of damage (actual) from two other types, liquidated and punitive damages.

Secondly, the statute is obviously intended to compensate for injury to privacy interests. Even innocuous disclosures, causing no provable damage whatever, will forge the government to pay $1,000 per occurrence. *See, e.g., Barrett,* 100 F.3d at 37 (affirming award of $260,000 in liquidated damages regarding 260 identical circular letters addressed to patients of a doctor; the doctor proved no actual damages). It is certainly consistent with the privacy protection purposes of the statute to include proven pain and suffering damages within "actual damages" if Congress has required the government to pay $1,000 when no damages are proven.

Third, to the extent the word "actual" is ambiguous, the legislative history provides no evidence that Congress understood "actual damages" to exclude pain and suffering

damages. *See, e.g.,* S.Rep. No. 94–938, pt. 1, at 348–49 (1976), *reprinted in* 1976 U.S.C.C.A.N. 3439, 3777–78 (this report explained the reasons why Congress adopted the first civil damage remedy for improper disclosure of tax return information; when discussing the three types of damages (liquidated, actual, and punitive) provided by the statute, the report reveals no intention to exclude damages like pain and suffering).

Fourth, a "good argument can be made that actual damages, as used in Code § 7431(c), does include other than pecuniary losses, because both § 7432 (civil damages for failure to release lien) and § 7433 (civil damages for certain unauthorized collection actions) call for 'actual, direct economic damages sustained by the plaintiff.'" Allan Karnes & Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information,* 23 Seaton Hall L.Rev. 924, 962 n. 251 (1993) (quoting 26 U.S.C. §§ 7432(b)(1) & 7433(b)(1)). Thus, when, in tax matters, Congress intended to limit the meaning of "actual damages," it modified the word "actual" with the words "direct" and "economic" to make the point clearly. The fact that Congress used the limiting words "direct" and "economic" in sections 7432 and 7433, but not in section 7431, suggests that the word "actual" may be given the *Webster's* all-inclusive meaning when applying section 7431.

Fifth, the case law supports a finding that pain and suffering damages are compensable under section 7431. There are only two cases that have directly ruled on whether section 7431 allows pain and suffering as an element of actual damages, and both of those cases have found that pain and suffering are included. *Ward v. United States,* 973 F.Supp. 996, 1002 (D.Colo.1997); *Hrubec v. National R.R. Passenger Corp.,* 829 F.Supp. 1502, 1505–06 (N.D.Ill.1993).

*Hrubec* is especially instructive. In that case, Judge Aspen carefully examined damage formulations used in privacy cases generally. He also examined other statutes that used the words "actual damage." [30] He then

---

**30.** Like Judge Aspen, I am aware that the "actual damage" language of the Privacy Act, 5 U.S.C.

§ 552a, has been interpreted in conflicting ways.

examined the purposes behind section 7431. Ultimately he came to the following conclusion, which I adopt:

> Inherent in the statute is a taxpayer's right to privacy in his filings. As with the right to privacy generally, when violated, the outstanding damage is mental and/or emotional distress. In order to further Congress' purpose, then, mental and emotional distress logically should be included in the 'actual damages' provided for in § 7431(c).

*Hrubec*, 829 F.Supp. at 1506.

The government argues that the case of *Rorex v. Traynor*, 771 F.2d 383, 387 (8th Cir.1985) suggests that section 7431 may not allow a claim for emotional distress. It is true that the court speculated in *Rorex* that the government's position might be correct. *Id.*

However, the "*Rorex* court made no determination that such injuries are non-compensable." Allan Karnes & Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information*, 23 Seaton Hall L.Rev. at 961 n. 251. On the contrary, the court only held that the evidence was insufficient to award such damages. *Rorex*, 771 F.2d at 387. Thus, *Rorex* is not helpful to the government.[31]

In summary, I hold that emotional distress damages are recoverable as actual damages under section 7431(c) where, as here, the plaintiffs have also proven "out-of-pocket" damages, such as the loss of an ongoing business.[32] With that holding in mind, I next turn to a determination of what damages to award.

### 2. Terry and Pat Jones Have Proven Emotional Distress Damages.

#### (a) More than "Hurt Feelings" Have Been Proven.

 The Court of Appeals has told us that "hurt feelings" are not alone compensable. *Rorex*, 771 F.2d at 387. The evidence in this case, however, goes far beyond "hurt feelings." I find and conclude that Terry and Pat Jones each proved that the unlawful disclosure was the factual and proximate cause of proven intense pain and suffering that included, but was not limited to, harm to their credit rating and reputations. *Compare Rorex*, 771 F.2d at 387 ("There is no evidence of harm to their ... credit rating ... [or] their general reputation in the community.").

It is helpful to highlight the evidence of the pain and suffering that Terry and Pat Jones endured as a result of the disclosure. As a preface, it must be remembered that the plaintiffs, who were long-time members of the community, enjoyed a spotless Dun & Bradstreet rating before the disclosure. In addition, Terry and Pat Jones were in relatively good health. After the disclosure, they suffered the following:

1. Social invitations from people the Joneses perceived to have been friends "came to a screeching halt."

2. The Jones' cleaning lady called them on the night of the IRS seizure, stating that she had seen the Joneses on television that evening, and she would not be coming back.

3. Business supplies for which Jones Oil had a charge account for 25 years were suddenly delivered COD.

4. Confronted with five underwriters asking whether Jones was the person who received the media attention, an insurance

---

**31.** I also note that in *Rorex* "[t]he government based its position on *Fitzpatrick v. I.R.S.*, 665 F.2d 327, 331 (11th Cir.1982), a Privacy Act case .... A later Fifth Circuit case held that actual damages under the Privacy Act included damages for not only out-of-pocket costs, but also for physical and mental injuries for which there was competent evidence in the record. *Johnson v. Dept. of Treasury, IRS*, 700 F.2d 971, 972 (5th Cir.1983)." Allan Karnes & Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code*

*Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information*, 23 Seaton Hall L.Rev. at 961 n. 251. As a result, much of the government's position in *Rorex* has been undermined.

**32.** It is unnecessary to decide whether emotional distress damages could be recovered when no other actual damages are proven. Accordingly, I express no opinion on such a question.

broker was unable to obtain commercial insurance for Terry Jones.

5. People with whom Pat Jones had previously developed business contacts became nonresponsive and critical.

6. The Joneses were forced to refinance their apartments with friends.

7. Terry Jones (a) became reclusive, withdrawn, and "wast[ed] away" from not eating, leading Dr. Paul to conclude that Terry Jones was clinically depressed to the point that antidepressant medication was needed for the first time; (b) slept only four hours per night; (c) quit showering and shaving; (d) was admitted to the hospital because, according to Dr. Paul, he was "run[ ]down, emaciated, his protein mass was wasted, his immunity was bad, he couldn't breathe, he couldn't walk, he was purple-gray and anemic, and he got pneumonia and . . . he was probably going to die."

8. Pat Jones had trouble sleeping, questioned her deeply-held religious faith, and found it necessary to consult a psychiatrist after she had an emotional crisis that caused her to contemplate suicide.

The government attempted to suggest that the emotional distress suffered by Mr. and Mrs. Jones was either not caused by the disclosure or was not sufficiently serious to warrant compensation. Without detailing each and every argument advanced by the government, it is enough to state that I am unconvinced by the government's assertions. Two examples will explain why I am not convinced.

The government argues that there is evidence that Terry Jones had a preexisting heart and lung condition and that he sought treatment for anxiety before the disclosure.[33] The government's assertion is correct. However, the totality of the evidence, particularly the testimony of Dr. Chester Paul, a longtime friend and physician who had the best

opportunity to carefully observe Jones over the longest period of time, makes clear that Terry Jones was relatively happy and healthy before the disclosure.[34] After the disclosure, the same evidence indicates that there was a dramatic adverse change in the overall health and well-being of Terry Jones. I am convinced that this change was caused by the disclosure. The evidence provides no other plausible explanation.

The government points out that when Pat Jones went to a psychiatrist on February 12, 1990, shortly after the disclosure and media attention, the doctor's notes do not reveal talk of suicide. Once again, the government's assertion is correct. However, the government misses the essential point. The doctor's notes reveal that Mrs. Jones "was increasingly apprehensive" and "ruminate[d] excessively." (Ex. 512.) As a result, the doctor suggested that Mrs. Jones take Valium to deal with her anxiety. (*Id.*) The significant point is not whether Mrs. Jones admitted suicidal thoughts to the doctor. On the contrary, the important point is that Mrs. Jones was sufficiently distressed by the unlawful disclosure and media attention that she sought and received medical attention shortly after the raid.

#### (b) The Amount

Terry and Pat Jones each seek one million dollars in emotional distress damages. While I do not doubt the sincerity of their request, such an award would be an abuse of discretion. *See, e.g., Kim v. Nash Finch Co.,* 123 F.3d 1046, 1065 & 1067 (8th Cir.1997) (reducing jury verdict from approximately $1.75 million to $100,000 for emotional distress where employee was denied promotion in violation of the civil rights laws; employee suffered anxiety, sleeplessness, stress, depression, high blood pressure, headaches, and humiliation); *Peoples Bank & Trust Co. v. Globe Int'l Publ'g, Inc.,* 978 F.2d 1065,

---

33. I note that the government must "take their victim as they find [him]." *Hurley v. Atlantic City Police Dept.,* 933 F.Supp. 396, 425 (D.N.J. 1996) (awarding, by way of remittitur, $175,000 for emotional distress in an employment discrimination case; plaintiff suffered from psychological disorders that arose partly because of childhood experiences and other unrelated events and partly because of sex discrimination).

34. The government relies upon one part of a psychiatrist's note indicating that Jones suffered from anxiety in June of 1989. However, that same note suggests that Jones was "sleeping well," was "[n]eatly groomed," and was "well oriented." (Ex. 2 to Ex. 542.) Importantly, the note concludes by stating that all "[p]sychological tests are normal." (*Id.*) Parenthetically, the psychiatrist was a personal friend of Mr. and Mrs. Jones. (Tr. 434:2–4.)

1070–71 (8th Cir.1992) (ordering "Substantial remittitur" where jury awarded $650,000 for emotional distress suffered by elderly woman whose picture had been used without her permission; tabloid falsely suggested that the woman was pregnant). Having stated what I believe is excessive, I now turn to what I will award.

### (i) Pat Jones

■ I have previously described in detail the emotional suffering of Mrs. Jones, and I shall not repeat it in detail. In brief, she suffered for approximately two years. Her suffering included loss of reputation, humiliation, damage to her faith, and suicidal thoughts. She sought the help of a psychiatrist.

By October 13, 1992, Mrs. Jones had recovered from the distress caused by the raid. On that date she answered a psychological profile questionnaire. Her answers indicate that she was no longer suffering from significant emotional difficulty except for some trouble sleeping. (Ex. 3, at 2 of Ex. 542 (Zung's SAS–SDS Questionnaire).) The difficulty sleeping was attributed to concerns about her adult son's decision not to practice law. (Ex. 542, at 21:2–24.)

On the profile, she indicated that "[m]ost or all of the time" "I feel that everything is all right and nothing bad will happen," "I feel calm and can sit still easily," "I feel that I am useful and needed," "[m]y life is pretty full," and "I still enjoy the things I used to do." (Ex. 3, at 2 of Ex. 542.) "None or a little of the time" did she "feel that others would be better off if I were dead." (*Id.*).

I find and conclude that an award of $75,-000 in damages for her emotional distress will fairly and justly compensate Mrs. Jones. In this regard, Mrs. Jones' suffering is generally analogous to the suffering described in *Ward,* another disclosure case, where a judgment of $75,000 for emotional distress was thought to be appropriate. *Ward,* 973 F.Supp. at 1002 (awarding $75,000 for emotional distress pursuant to section 7431(c)(1)(B); government's conduct caused the plaintiff to become bitter).

### (ii) Terry Jones

■ Terry Jones' distress was both more long-lasting and much more severe than Pat Jones' suffering. Jones' distress lasted seven years. In addition to loss of reputation and humiliation, Terry Jones suffered serious medical complications as a result of his emotional distress.[35] As late as February of 1997, Terry Jones required hospitalization. At that time, according to his doctor, he was clinically depressed, emaciated, his immunity was bad, he had difficulty breathing and walking, he was purple-gray and anemic, he contracted pneumonia, and he nearly died. It was only after the February, 1997, hospitalization that Terry Jones recovered. Thankfully, Mr. Jones is now "a new man" who "looks very good" according to Dr. Paul. (Tr. 388:16–389:10.)

An award of $250,000 will fairly and justly compensate Terry Jones for his emotional distress. I recognize that this award is at the high end of other federal decisions awarding emotional distress damages. I conclude, nevertheless, that an award of $250,000 is justified, particularly given the very serious medical complications that arose as a result of the emotional distress and the fact that the distress spanned seven years. *Compare, e.g., Blakey v. Continental Airlines, Inc.,* 992 F.Supp. 731, 738–41 (D.N.J. 1998) (granting remittitur of jury verdict; jury awarded $500,000 for emotional distress; judge reduced award for emotional distress to $250,000; plaintiff was a female airline pilot subjected to sexual harassment in the work place; the plaintiff saw her psychologist 25 times over a period of "several years"; the plaintiff's "physical symptoms ... became so severe that she was placed on psychotropic medication"; the plaintiff's "symptoms were identifiable, treated by a professional, and resulted in medication and medical leave") *with Mitchell v. Globe Int'l Publ'g, Inc.,* 817 F.Supp. 72, 73–74 (W.D.Ark. 1993) (granting remittitur of jury verdict; jury awarded $650,000 for emotional distress; at the direction of the Court of Appeals, the judge reduced the award to $150,000; tabloid had used picture of 96–year–old woman without her permission and suggested that she

---

**35.** Jones did not submit a claim for the hospital or doctor bills.

was pregnant; no evidence that woman needed medical or psychological treatment as a result of the distress).

### G. The Plaintiffs are Not Entitled to Punitive Damages.

 Section 7431(c) provides for punitive damages "in the case of a willful ... disclosure or ... disclosure which is the result of gross negligence." The plaintiffs are not entitled to punitive damages.

Whether the conduct of Stennis is viewed objectively or subjectively, he did not act willfully or with gross negligence when he made the unlawful disclosure. Fundamentally, I have three reasons for this conclusion. First, Stennis acted out of a desire to protect the confidential informant, as opposed to a desire to harm or punish the taxpayers. *Jones I*, 898 F.Supp. at 1385 n. 19, 1386–87. Second, Stennis trusted the confidential informant and he had reasons for that trust; that is, Stennis did not anticipate (albeit erroneously) that the media would be called and he had a plausible factual basis to support that view. (Tr. 595:5–597:20.) Third, there was no "precise statutory, regulatory, judicial, internal procedural, or practical guidance" given to agents like Stennis; that is, IRS agents had little guidance in dealing with informants while complying with the anti-disclosure provisions of the law "in the shadowy world where informants and criminal investigators interact." *Jones I*, 898 F.Supp. at 1385.

While Stennis "knowingly" disclosed return information within the meaning of 26 U.S.C. § 7431(a)(1), *id.* at 1376 n. 16, he did not do so "willful[ly]" or with "gross negligence." *See, e.g., Rorex v. Traynor*, 771 F.2d at 388 (reversing award of punitive damages where agent served notice of levy on taxpayer's bank that disclosed return information; levy was not justified because taxpayers were meeting their obligation to the IRS and thus disclosure was both unnecessary and improper); Allan Karnes & Roger Lirely, *Striking Back at the IRS: Using Internal Revenue Code Provisions to Redress Unauthorized Disclosures of Tax Returns or Return Information*, 23 Seaton Hall L.Rev. at 962 ("Punitive damages have been awarded only rarely ....") (collecting cases).

### IV. CONCLUSION

Due to the unfortunate length of this opinion, a summary is needed. In short, this is what the court has found as fact and has concluded as law:

1. Terry and Pat Jones are the proper persons to receive any damage award.

2. The unlawful disclosure was "with respect to" Pat Jones, as well Terry Jones and Jones Oil.

3. Since they are entitled to "actual damages," the plaintiffs are not entitled to liquidated damages.

4. The plaintiffs proved factual and proximate causation for the damages the court will award.

5. The plaintiffs are entitled to more than: (a) 4.5 million dollars in damages for the loss they sustained when Jones Oil failed; (b) $500,000 in damages for the loss they sustained when real estate used by Jones Oil was sold; (c) $24,000 in damages for the loss they sustained when personal property used by Jones Oil was sold.

6. The plaintiffs are not entitled to damages for the Tennessee tax refund claim, the Jones Publishing claim, or the "out-of-pocket" expense claim.

7. Pat Jones is entitled to $75,000 in emotional distress damages, and Terry Jones is entitled to $250,000 in emotional distress damages.

8. The plaintiffs are not entitled to punitive damages.

IT IS ORDERED that:

1. Judgment shall be entered by separate document. The judgment shall provide in substance that:

Judgment is entered for the plaintiffs and against the defendant United States of America for actual damages plus costs and post-judgment interest as provided by law. Otherwise, the plaintiffs shall take nothing. The amount of actual damages that shall be paid by the United States and the names of the plaintiffs entitled to receive the actual damages are set forth below:

Terry Jones and Pat Jones, jointly, as their interests may appear, shall be paid:

(a) damages for the demise of Jones Oil Company, to wit: (1) $4,516,083 (representing the damages as of January 31, 1998); (2) plus a sum equivalent to interest on $4,516,083 at 5.232 percent, computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment).

(b) damages for the forced sale of real estate, to wit: (1) $565,356 (representing the damages as of January 31, 1998); (2) plus a sum equivalent to interest on $565,356 at 5.232 percent, computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment);

(c) damages for the forced sale of personal property, to wit: (1) $24,760 (representing the damages as of January 31, 1998); (2) plus a sum equivalent to interest on $24,760 at 5.232 percent, computed in accordance with 28 U.S.C. § 1961(b) from February 1, 1998, to the date of judgment (representing the damages brought forward from February 1, 1998, until the date of judgment).

Pat Jones shall be paid damages for emotional distress, to wit: $75,000.

Terry Jones shall be paid damages for emotional distress, to wit: $250,000.

2. Judgment shall be withheld pending resolution of a request for attorney fees.

3. Any request for attorney fees shall be submitted in accordance with the local rules of practice within 14 calendar days of this date, and the United States shall have 14 calendar days thereafter to respond.